**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BARTON CICERO, individually and on behalf of all other persons similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SEGWAY INC., <br><br> Defendant. | C.A. No. 25-cv-00369-GBW |
| AARON JOHN SABU and CHRISTOPHER HOLMES, individually and on behalf of all other persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SEGWAY INC., <br><br> Defendant. | C.A. No. 25-cv-00394-GBW |
| MARY RZEWUSKI and EDWARD STEVEN HEYMER, individually and on behalf of all other persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SEGWAY INC., <br><br> Defendant. | C.A. No. 25-cv-00463-GBW |

**DECLARATION OF YEREMEY KRIVOSHEY IN SUPPORT OF PLAINTIFFS' MOTION FOR CONSOLIDATION AND APPOINTMENT OF INTERIM CO-LEAD COUNSEL**

I, Yeremey Krivoshey, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California.  I am a founding partner at Smith Krivoshey, PC, counsel for Plaintiffs in *Cicero v. Segway Inc.*, C.A. No. 25-cv-00369-GBW and *John Sabu, et al. v. Segway Inc.*, C.A. No. 25-cv-00394-GBW, pending in this Court.  I am an attorney at law licensed to practice in the State of California, and I

have been admitted to practice *pro hac vice* in the *Cicero* and *John Sabu* matters.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2.      I graduated from Vanderbilt University *cum laude* with bachelor's degrees in Psychology and Political Science in 2010.  In 2013, I graduated from New York University School of Law.  Since graduating law school, I have exclusively litigated consumer class actions and have achieved tremendous results for class members.  Prior to forming Smith Krivoshey, PC, I was a partner at Bursor & Fisher, P.A., a well-regarded plaintiffs' class action law firm, in their San Francisco Bay Area office.

3.      Both collectively, and individually, the attorneys at Smith Krivoshey, PC have established themselves as tough, bright, and very successful litigators.  The founders of Smith Krivoshey have never lost a trial, having won every case tried to verdict.  For instance, in 2019, I secured a $267 million class action verdict in *Perez v. Rash Curtis & Associates* after a jury trial in the Northern District of California, which was the 12th largest verdict in the United States in all practice areas that year, and the 3rd highest class action verdict.  In 2021, the case settled for $75.6 million while on appeal, still the largest consumer class action settlement in the history of the Telephone Consumer Protection Act.  Joel Smith, my co-founding partner at Smith Krivoshey, PC, has trial experience on both sides of the aisle.  In a highly publicized trial against a Sacramento subsidiary of Entercom Communications Corp., Mr. Smith was part of a trial team that secured a successful outcome for his client (a radio station manager) despite his client's employer being hit with a $16.5 million jury award.  With a proven trial track record, the founders of Smith Krivoshey have also secured numerous favorable settlements on the eve of trial.

4.      The attorneys at Smith Krivoshey have served as lead or co-lead class counsel in dozens of class actions throughout the country.  In the process, they have obtained hundreds of millions in recoveries for class members, including settlements of $83.6 million in a class case against *Six Flags*, $75.6 million in *Perez* (paid out by the Indian Harbor Insurance Company, a defendant in a spin-off bad faith insurance case), $74 million in a class case against BMW, $40

million in a class case against Harbor Freight Tools, $35 million in a class case against Western Dental, $30 million in a class case against Momentum Solar, $20.4 million in a class case against Alterra Mountain Company, and many more millions in class settlements against Turkish Airlines, Lufthansa, Kimberly-Clark, Millennium Products, National Credit Adjusters, The Regents of the University of California, Jaguar Land Rover North America, Mattress Firm, Health-Ade, and others.

5.      Judges have routinely commended Smith Krivoshey's attorneys when appointing them as class counsel or at the end of the litigation during settlement approval.  For instance, in appointing Smith Krivoshey as Class Counsel in July 2024 in a case against the University of Southern California, Judge Kenneth Freeman, Ret., (Los Angeles Cnty. Superior Court Judge) noted that "the experience of [Smith Krivoshey] in representing consumers in class actions is extensive."  In January 2024, Judge Michael A. Hammer (D.N.J.) appointed Mr. Krivoshey as lead interim class counsel in a putative class action against one of the top private solar companies in the country, finding that he had the "requisite experience in handling class actions" and "clearly has established a knowledge of the applicable law."  The Court was also "satisfied from its oversight of this matter that proposed interim class counsel have committed, and will continue to commit, the necessary resources to represent the class."  When awarding a $28 million attorneys' fees award in 2021 at the conclusion of the *Perez* case, which Mr. Krivoshey spearheaded from its inception, Judge Yvonne Gonzalez Rogers (N.D. Cal.) remarked: "This Court does not often offer praise, expecting high performance from all counsel.  Here though, experienced counsel has done an excellent job on behalf of plaintiff and the class and vigorously pursued the claim despite numerous hurdles."  Similarly, in January 2023, Judge Raymond P. Moore (D. Co.) commended Mr. Krivoshey's "high level of skill and expertise" in navigating a class action through "uncharted legal territory" as appointed class counsel against one of the top two ski resort companies in the country.

6.      Attached hereto as **Exhibit 1** is a copy of Smith Krivoshey, PC's firm resume.

3

7.      Smith Krivoshey is well funded and staffed to take cases the distance.  The firm has never taken on litigation financing.  Nor has the firm ever taken out loans or financing for its own operations.

8.      To date, I have performed the following work so far in these cases:

a.   Interview dozens of putative class members, and vetted emails and client intake for dozens of other class members;

b.   Researched Defendant's corporate structure;

c.   Researched the products and the defects at issue in the action;

d.   Drafted the Complaint in *Cicero v. Segway Inc.*, C.A. No. 25-cv-00369-GBW;

e.   Drafted the Complaint in *John Sabu, et al. v. Segway Inc.*, C.A. No. 25-cv-00394-GBW;

f.   Reached out to multiple potential class certification experts, and have spoken to an expert I intend on retaining for class certification and trial (and who has confirmed his availability and willingness to serve in that capacity);

g.   Researched putative damages theories, and various class certification issues;

h.   Vetted and retained local Delaware counsel;

i.   Coordinated with plaintiff's counsel in the *Rzewuski et al. v. Segway, Inc.*, C.A. No. 25-cv-00463-GBW action, to maximize efficiency and come up with a cohesive and lean putative leadership structure;

j.   Kept abreast of other litigation involving Defendant, particularly involving other actions concerning the same products and defect at issue in this case; and

k.   Met and conferred with defense counsel about the substance of this motion.

9.      Attached hereto as **Exhibit 2** is the filed complaint in *Austin v. Segway, Inc.*, Case No. 2:25-cv-01743-KNS (E.D. Pa.).

10.      Attached hereto as **Exhibit 3** is the filed complaint in *Hanson v. Segway Inc.*, Case No. 2:25-cv-03305 (C.D. Cal.).

11.     If appointed as Interim Co-Lead Class Counsel, I and my law firm are willing and able to litigate this matter through class certification, summary judgment, trial and appeal, if necessary.

12.     Attached hereto as **Exhibit 4** is a copy of the firm resume of Cooch and Taylor P.A.

I declare under penalty of perjury under the laws of the United States and the State of Delaware that the foregoing is true and correct.  Executed in Louisville, Kentucky, on May 5, 2025.

_____
Yeremey Krivoshey

# Exhibit 1



# SMITH KRIVOSHEY, PC

**166 GEARY STREET**
**SAN FRANCISCO, CA 94108**

**867 BOYLSTON STREET**
**BOSTON, MA 02116**

## <u>FIRM RESUME</u>

The attorneys of Smith Krivoshey, PC have decades of experience litigating complex, record-breaking cases to trial and have secured hundreds of millions in class recoveries in the process.  They have secured well publicized trial victories, verdicts, and settlements on behalf of both plaintiffs and defendants.  With offices in San Francisco and Boston, they run a busy class action practice spanning the country, in both state and federal courts.

The founders of Smith Krivoshey have never lost a trial, having won every case tried to verdict.  In 2019, Mr. Krivoshey secured a $267 million class action verdict in *Perez v. Rash Curtis & Associates* after a jury trial in the Northern District of California, which was the 12th largest verdict in the United States in all practice areas that year, and the 3rd highest class action verdict.  In 2021, the case settled for $75.6 million while on appeal, still the largest consumer class action settlement in the history of the Telephone Consumer Protection Act.  Mr. Smith has trial experience on both sides of the aisle.  In a highly publicized trial against a Sacramento subsidiary of Entercom Communications Corp., Mr. Smith was part of a trial team that secured a successful outcome for his client (a radio station manager) despite his client's employer being hit with a $16.5 million jury award.  With a proven trial track record, the founders of Smith Krivoshey have also secured numerous favorable settlements on the eve of trial.

Judges throughout the country have commended Smith Krivoshey and its attorneys on their experience and qualifications.  For instance, in appointing Smith Krivoshey as Class Counsel in July 2024 in a case against the University of Southern California, Judge Kenneth Freeman noted that "the experience of [Smith Krivoshey] in representing consumers in class actions is extensive."

Prior to forming Smith Krivoshey, Mr. Krivoshey and Mr. Smith were partners at Bursor & Fisher, P.A., a prestigious class action law firm, for over a decade.  The attorneys at Smith Krivoshey have also represented some of the largest Fortune 500 companies, public entities, and privately held companies in the world working at firms including Folger Levin & Kahn, Crowell & Morning, Dentons, and Littler Mendelson.

Mr. Smith and Mr. Krivoshey have served as lead or co-lead class counsel in dozens of class actions throughout the country.  In the process, they have obtained hundreds of millions in recoveries for class members, including settlements of $83.6 million in a class case against *Six Flags*, $75.6 million in *Perez* (paid out by the Indian Harbor Insurance Company, a defendant in a spin-off bad faith insurance case), $74 million in a class case against BMW, $40 million in a class case against Harbor Freight Tools, $35 million in a class case against Western Dental, $20.4 million in a class case against Alterra Mountain Company, and many more millions in class settlements against Turkish Airlines, Lufthansa, Kimberly-Clark, Millennium Products, National Credit Adjusters, The Regents of the University of California, Jaguar Land Rover North America, Mattress Firm, Health-Ade, and others.

Most recently, in January 2025, Smith Krivoshey obtained preliminary approval of a $30 million settlement in a TCPA class action brought against Momentum Solar.  The settlement is

the biggest non-reversionary cash common fund *ever* in a pure telemarketing class action brought under the TCPA, and the biggest non-reversionary cash common fund in *any* TCPA action settled after the Supreme Court's decision in *Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021), which effectively gutted the TCPA's restrictions on the use of automatic telephone dialing systems.

Smith Krivoshey is well funded and staffed to take cases the distance. The firm is efficient, and does not overbill. Its attorneys have repeatedly proven that they excel at the highest levels of civil litigation, and have the determination, skill, experience, and knowledge necessary to maximize recoveries for class members. They are passionate about what they do, and they do it well.

## JOEL D. SMITH

Joel D. Smith is a founding member of Smith Krivoshey. Joel is a trial and appellate attorney who has practiced in lower court and appeals courts across the country, as well as the U.S. Supreme Court.

A no-nonsense, hardworking, and well-organized litigator, Joel has been appointed lead or co-lead counsel in numerous class actions across the country, including in cases against Facebook, major automotive manufacturers, and public entities. He is skilled at managing complex, multi-party litigation and works well with co-counsel and opposing counsel alike. For example, Joel represented four major U.S. retailers in a highly publicized case arising from an arson fire and ensuing state of emergency in Roseville, California, which settled on the eve of a trial that was expected to last several months and involve more than forty witnesses. He managed the litigation in *In re Welspun*, a case against five corporate giants arising from what one journalist described as the "biggest counterfeit story in retail history." He has obtained hundreds of millions of dollars for class members in class settlements.

Joel co-founded Smith Krivoshey after nearly twenty years of experience on both sides of the aisle at Folger Levin & Kahn, Crowell & Moring, and Bursor & Fisher. He has both represented, and litigated against, some of the largest Fortune 500 companies, public entities, and privately held companies in the United States.

A graduate of U.C. Berkeley's School of Law, Joel is admitted in California and Massachusetts, as well as numerous district and circuit courts across the country. He is a member of the Massachusetts Chapter of the Federal Bar Association, where he volunteers in the FBA's Lift Up Leaders Mentorship Program and serves on the Professional Development Committee. He also is a member of the American Association for Justice, and the Public Justice Foundation.

### *Selected Published Decisions:*

*Krikbridge et al. v. The Kroger Co.*, Case No. 2:21-cv-00022 (S.D. Oh. Mar. 28, 2025), granting class certification in class action concerning Kroger's alleged overcharging for prescription mediation.

*Stoffel v. Regents of the University of California*, 2024 WL 3155551 (Cal. App. June 25, 2024), reversing dismissal in class action concerning the U.C. system's transition to remote learning during the COVID-19 pandemic.

*Javier v. Assurance IQ, LLC*, --- Fed App'x --- 2022 WL 1744107 (9th Cir. May 31, 2022), reversing dismissal in a class action alleging surreptitious monitoring of internet communications.

*Revitch v. DIRECTV, LLC*, 977 F.3d 713 (9th Cir. 2020), affirming denial of motion to compel arbitration in putative class action alleging unlawful calls under the Telephone Consumer Protection Act.

*Foot Locker Retail, Inc. v. Madison Bay Fair LLC*, 2018 WL 6191353 (Cal. App. Nov. 28, 2018), reversing a bench trial judgement and award of costs and fees against Mr. Smith's client.

*Sarkissian Mason, Inc. v. Enterprise Holdings, Inc.*, 572 Fed. Appx. 19 (2nd Cir. 2014), affirming summary judgment in favor of Mr. Smith's client in breach of contract and trade secrets case.

*Ecological Rights Foundation v. Pacific Gas & Elec. Co.*, 713 F.3d 502 (9th Cir. 2013), affirming dismissal in favor of Mr. Smith's client in Clean Water Act case.

*Chaisson, et al. v. University of Southern California* (Cal. Sup. Ct. July 25, 2024), granting class certification of class of students that were charged late fees and appointing Smith Krivoshey as class counsel.

*In re Nissan N. America, Inc. Litig.*, 2023 WL 2749161 (M.D. Tenn. Mar. 31, 2023), granting certification of ten state damages classes in automotive defect case.

*Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116 (C.D. Cal. Sept. 23, 2020), granting class certification of consumer protection claims brought by purchasers of defective chainsaws.

*Revich v. New Moosejaw, LLC*, 2019 WL 5485330 (N.D. Cal. Oct. 23, 2019), highly-cited order denying in part a motion to dismiss in matter alleging internet wiretapping

### *Selected Class Settlements:*

*In re Beyond Meat, Inc. Protein Content Marketing & Sales Practices Litigation*, Case No. 1:23-cv-00669 (N.D. Ill.) – final approval granted for settlement resolving claims that Beyond Meat misled customers about the protein content of its products.

*George et al. v. Jaguar Land Rover N. America, LLC*, Case No. 2:20-cv-17561-JSA (D.N.J.) – final approval granted for settlement providing relief for Jaguar and Land Rover owners to resolve allegations that the vehicle's infotainment systems were defective.

*Recinos et al. v. The Regents of the University of California,* Superior Court for the State of California, County of Alameda, Case No. RG19038659 – final approval granted for a settlement providing debt relief and refunds to University of California students who were charged late fees.

*Crandell et al. v. Volkswagen Group of America*, Case No. 2:18-cv-13377-JSA (D.N.J.) – final approval granted for a settlement providing relief for Volkswagen Touareg owners to resolve allegations that defects in Touareg vehicles caused the engines to ingest water when driving in the rain.

*Isley et al. v. BMW of N. America, LLC*, Case No. 2:19-cv-12680-ESK (D.N.J.) – final approval granted for settlement providing BMW owners with reimbursements and credit vouchers to resolve allegations that defects in the BMW N63TU engine caused excessive oil consumption.

*Kaupelis v. Harbor Freight Tools USA, Inc.*, 8:19-cv-01203-JVS-DFM (C.D. Cal.) – final approval granted for a settlement valued up to $40 million to resolve allegations that Harbor Freight sold chainsaws with a defective power switch that could prevent the chainsaws from turning off.

*Payero et al. v. Mattress Firm*, Case No. 7:21-cv-03061-VLB (S.D.N.Y.) final approval granted for $4.9 million settlement resolving allegations that Mattress Firm sold dangerously defective bed frames.

### YEREMEY KRIVOSHEY

Yeremey Krivoshey is a founding partner at Smith Krivoshey.  He is one of the leading class action litigation attorneys in the country and has achieved extraordinarily rare results in the field.  Mr. Krivoshey has extensive expertise litigating class cases concerning unlawful fees and liquidated damages in consumer contracts, statutory damages class actions, TCPA cases, product recall cases, privacy cases, and fraud and false advertising class actions.  He has represented clients in a wide array of civil litigation in state and federal courts throughout the country, including appeals before the Ninth Circuit.

In 2021, Mr. Krivoshey secured the largest-ever consumer class action settlement in a case brought under the Telephone Consumer Protection Act.  The settlement followed a class action trial win in the Northern District of California, where the federal court awarded a $267 million judgment after a jury trial.  While many class action attorneys *claim* to be trial attorneys, very few have actually litigated a certified class action through trial, and won.

Mr. Krivoshey has routinely drawn praise from judges for his work as class counsel.  For instance, in January 2024, Judge Michael A. Hammer (D.N.J.) appointed Mr. Krivoshey as lead interim class counsel in a putative class action against one of the top private solar companies in the country, finding that he had the "requisite experience in handling class actions" and "clearly has established a knowledge of the applicable law."  The Court was also "satisfied from its oversight of this matter that proposed interim class counsel have committed, and will continue to commit, the necessary resources to represent the class."  When awarding a $28 million attorneys' fees award in 2021 at the conclusion of the *Perez* case, which Mr. Krivoshey spearheaded from its inception, Judge Yvonne Gonzalez Rogers (N.D. Cal.) remarked: "This Court does not often offer praise, expecting high performance from all counsel.  Here though, experienced counsel has

done an excellent job on behalf of plaintiff and the class and vigorously pursued the claim despite numerous hurdles." Similarly, in January 2023, Judge Raymond P. Moore (D. Co.) commended Mr. Krivoshey's "high level of skill and expertise" in navigating a class action through "uncharted legal territory" as appointed class counsel against one of the top two ski resort companies in the country.

Mr. Krivoshey brings a diverse and unique perspective to class action litigation. He emigrated from Belarus as a refugee at 8 years old, and spent the first years in America living in a tiny basement apartment with a large family, pets included. Though the accent is long gone, the connection to underrepresented and distressed communities continues to fuel his passion for consumer advocacy. Consumer class actions provide a tremendous tool to fight the feeling of being taken advantage of when facing corporate power as an individual. This work is personal, and uplifting.

Mr. Krivoshey sought to experience as much of America's immensely rich and diverse culture as possible from an early age. He grew up in Louisville, Kentucky, received undergraduate degrees in Political Science and Psychology from Vanderbilt University in Nashville, Tennessee, and graduated from New York University School of Law. In that span, he worked for the Department of Justice on bankruptcy and employment cases, at the ACLU focused on first and fourth amendment issues, and at an environmental NGO in Honolulu, Hawaii.

After law school, Mr. Krivoshey spent over a decade litigating consumer class actions at Bursor & Fisher, P.A. San Francisco Bay Area office. Mr. Krivoshey made partner in 2018, and gained a national reputation through victories and class settlements in federal and state courts throughout the country. Mr. Krivoshey then co-founded Smith Krivoshey to pursue his vision of a modern, diverse, and responsible class action litigation firm.

### *Selected Published Decisions:*

*Bayol v. Zipcar, Inc.*, 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014), denying enforcement of forum selection clause based on public policy grounds.

*Bayol v. Zipcar, Inc.*, 78 F. Supp. 3d 1252 (N.D. Cal. Jan. 29, 2015), denying car-rental company's motion to dismiss its subscriber's allegations of unlawful late fees.

*Brown v. Comcast Corp.*, 2016 WL 9109112 (C.D. Cal. Aug. 12, 2016), denying internet service provider's motion to compel arbitration of claims alleged under the Telephone Consumer Protection Act.

*Chaisson, et al. v. University of Southern California* (Cal. Sup. Ct. Mar. 25, 2021), denying university's demurrer as to its students' allegations of unfair and unlawful late fees.

*Chaisson, et al. v. University of Southern California* (Cal. Sup. Ct. July 25, 2024), granting class certification of class of students that were charged late fees and appointing Smith Krivoshey as class counsel.

*Choi v. Kimberly-Clark Worldwide, Inc.*, 2019 WL 4894120 (C.D. Cal. Aug. 28, 2019), denying tampon manufacturer's motion to dismiss its customer's design defect claims.

*Goodrich, et al. v. Alterra Mountain Co., et al.,* 2021 WL 2633326 (D. Col. June 25, 2021), denying ski pass company's motion to dismiss its customers' allegations concerning refunds owed due to cancellation of ski season due to COVID-19.

*Horanzy v. Vemma Nutrition Co.*, Case No. 15-cv-298-PHX-JJT (D. Ariz. Apr. 16, 2016), denying multi-level marketer's and its chief scientific officer's motion to dismiss their customer's fraud claims.

*McMillion, et al. v. Rash Curtis & Associates*, 2017 WL 3895764 (N.D. Cal. Sept. 6, 2017), granting nationwide class certification of Telephone Consumer Protection Act claims by persons receiving autodialed and prerecorded calls without consent.

*McMillion, et al. v. Rash Curtis & Associates*, 2018 WL 692105 (N.D. Cal. Feb. 2, 2018), granting plaintiffs' motion for partial summary judgment on Telephone Consumer Protection Act violations in certified class action.

*Perez v. Indian Harbor Ins. Co.*, 2020 WL 2322996 (N.D. Cal. May 11, 2020), denying insurance company's motion to dismiss or stay assigned claims of bad faith and fair dealing arising out of $267 million trial judgment.

*Perez v. Rash Curtis & Associates*, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020), upholding constitutionality of $267 million class trial judgment award.

*Salazar v. Honest Tea, Inc.*, 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015), denying manufacturer's motion for summary judgment as to customer's false advertising claims.

*Sholopa v. Turk Hava Yollari A.O., Inc. (d/b/a Turkish Airlines)*, 2022 WL 976825 (S.D.N.Y. Mar. 31, 2022), denying airline's motion to dismiss its customers claims for failure to refund flights cancelled due to COVID-19.

### ***Selected Class Settlements:***

*Perez v. Rash Curtis & Associates*, Case No. 16-cv-03396-YGR (N.D. Cal. Oct. 1, 2021) granting final approval to a $75.6 million non-reversionary cash common fund settlement, the largest ever consumer class action settlement stemming from a violation of the Telephone Consumer Protection Act.

*Strassburger v. Six Flags Theme Parks Inc., et al.* (Ill. Cir. Ct. 2022) granting final approval to $83.6 million settlement to resolve claims of theme park members for alleged wrongful charging of fees during the COVID-19 pandemic.

*Juarez-Segura, et al. v. Western Dental Services, Inc.* (Cal. Sup. Ct. Aug. 9, 2021) granting final approval to $35 million settlement to resolve claims of dental customers for alleged unlawful late fees.

*Niemczyk v. Pro Custom Solar LLC* (D.N.J. Sep. 20, 2024) $22-30 million non-reversionary cash common fund settlement to resolve claims of class members receiving unsolicited telemarketing calls.

*Goodrich v. Alterra Mountain Company* (D. Colo. Jan. 27, 2023) granting final approval to $20.4 million settlement to resolve claims of ski pass customers for alleged wrongful withholding of refunds due to shortened 2019-2020 ski season.

*Sholopa v. Turkish Airlines* (S.D.N.Y. Aug. 25, 2023) granting final approval to $14.1 million settlement to resolve claims of airline passengers for alleged late or missing refunds for flights cancelled due to COVID-19.

*Moore v. Kimberly-Clark Worldwide, Inc*. (Ill. Cir. Ct. July 22, 2020) granting final approval to $11.2 million settlement to resolve claims of tampon purchasers for alleged defective products.

*Retta v. Millennium Prods., Inc*., 2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) granting final approval to $8.25 million settlement to resolve claims of kombucha purchasers for alleged false advertising.

*Cortes v. National Credit Adjusters, L.L.C.* (E.D. Cal. Dec. 7, 2020) granting final approval to $6.8 million settlement to resolve claims of persons who received alleged autodialed calls without prior consent in violation of the TCPA.

*Bayol et al. v. Health-Ade LLC, et al.* (N.D. Cal. Oct. 11, 2019) – granting final approval to $3,997,500 settlement to resolve claims of kombucha purchasers for alleged false advertising.

## BRITTANY SCOTT

Brittany is a partner at Smith Krivoshey.  Brittany is admitted to the State Bar of California and is a member of the bars of the United States District Court for the Northern, Central, Eastern, and Southern Districts of California, the Eastern District of Wisconsin, the Northern District of Illinois, the Western District of Michigan, the Second Circuit Court of Appeals, the Seventh Circuit Court of Appeals, and the Ninth Circuit Court of Appeals.

She is skilled at efficiently managing complex litigation and moving cases forward expediently for the benefit of her clients and class members.  Brittany's practice has spanned the breadth of consumer protection litigation from false and misleading advertising to data privacy claims under statutes such as the Illinois Biometric Information Privacy Act, California Invasion of Privacy Act, and the Fair Credit Reporting Act.  Brittany has been lead and co-lead counsel in class actions across the country, including *In Re: Apple Data Privacy Litigation*, Case No. 5:22-cv-07069 (N.D. Cal.).  She has recovered millions of dollars for consumers in state and federal courts throughout the United States.

Prior to joining Smith Krivoshey, Brittany worked for Bursor & Fisher, P.A.  During that time, she litigated hundreds of consumer class cases with a focus on false and misleading advertising and data privacy.

Brittany received her Juris Doctor from the University of California Law, San Francisco, graduating *cum laude*. During law school, she was a member of the Constitutional Law Quarterly, for which she was the Executive Notes Editor. Brittany published a note in the Constitutional Law Quarterly entitled "Waiving Goodbye to First Amendment Protections: First Amendment Waiver by Contract." Brittany also served as a judicial extern to the Honorable Andrew Y.S. Cheng for the San Francisco Superior Court. Brittany graduated from the University of California with a B.A. in Political Science.

### *Selected Published Decisions:*

*Gibson v. Albertsons Companies, Inc.*, 2024 WL 4514041 (N.D. Ill. Oct. 17, 2024), denying cough suppressant retailer's motion to dismiss purchaser's false advertising claims.

*Ramirez v. Trusper, Inc.*, 2024 WL 4479862 (N.D. Cal. Oct. 11, 2024), denying health care provider's motion to compel arbitration in putative class action alleging wiretapping under California's Invasion of Privacy Act.

*St. Aubin v. Carbon Health Techs., Inc.*, 2024 WL 4369675 (N.D. Cal. Oct. 1, 2024), denying health care provider's motion to dismiss its patient's allegations of wiretapping.

*Mitchell v. Sonesta Int'l Hotels Corp.*, 2024 WL 4471772 (C.D. Cal. Oct. 4, 2024), adopted as modified, 2024 WL 4474491 (C.D. Cal. Oct. 4, 2024), denying hotel's motion to dismiss its guest's allegation of wiretapping.

*Lawrence v. Finicity Corp.*, 716 F. Supp. 3d 851, 870 (E.D. Cal. 2024), denying motion to dismiss and motion to compel arbitration of claims under California's Anti-Phishing Act.

*Natale v. 9199-4467 Quebec Inc.*, 2023 WL 4850531 (E.D.N.Y. July 28, 2023), denying pet supply company's motion to dismiss purchaser's false advertising claims.

*Locklin v. StriVectin Operating Co., Inc.*, 2022 WL 867248 (N.D. Cal. Mar. 23, 2022), denying sunscreen manufacturer's motion to dismiss purchaser's false advertising claims.

### *Selected Class Settlements:*

*Morrissey v. Tula Life, Inc.*, Case No. 2021L0000646 (Cir. Ct. DuPage Cnty. 2021) – final approval granted for $4 million class settlement to resolve claims of cosmetics purchasers for alleged false advertising.

*Clarke et al. v. Lemonade Inc.*, Case No. 2022LA000308 (Cir. Ct. DuPage Cnty. 2022) – final approval granted for $4 million class settlement to resolve claims for alleged BIPA violations.

*Whitlock v. Jabil Inc.*, Case No. 2021CH00626 (Cir. Ct. Cook Cnty. 2022) – final approval granted for $995,000 class settlement to resolve claims for alleged BIPA violations.

*Darnall et al. v. Dude Products Inc.*, Case No. 2023LA000761 (Cir. Ct. Cook Cnty. 2023) – final approval granted for $9 million class settlement to resolve claims of wipe purchasers for alleged false advertising.

*Natale et al. v. 9199-4467 Quebec Inc. d/b/a Earth Rated*, Case No. 2:21-cv-6775 (S.D.N.Y. 2023) – final approval granted for $825,000 class settlement to resolve claims of dog waste bag purchasers for false advertising.

## ALEKSANDR LITVINOV

Aleksandr Litvinov works for Smith Krivoshey as Counsel.  He is an ardent trial lawyer, advisor, and problem solver.  Prior to Smith Krivoshey, Mr. Litvinov spent nearly a decade advising and defending corporations with a primary focus on employment litigation and compliance.  He has worked at some of the world's largest corporate law firms and employment boutiques, including Dentons, Hogan Lovells, Fisher Phillips, and Littler Mendelson.  Mr. Litvinov has helped guide industry giants such as Amazon, FedEx, Uber, Kroger, and Humana through a variety of legal claims in jurisdictions across the country.  This experience has developed Mr. Litvinov's understanding of litigation strategies and how corporations and insurance adjusters investigate, value, and defend claims.

Mr. Litvinov has successfully litigated harassment, discrimination, and retaliation claims, wage and hour claims, employment-related torts, and contract claims.  He has secured dismissal and summary judgment on behalf of public employers as well as private employers in the retail, supply chain, distribution, manufacturing, tech, healthcare, energy, and hospitality industries.  For example, in *Lainhart, et al. v. Louisville-Jefferson County Metro Government*, Mr. Litvinov assisted a trial team who saved the city of Louisville over $150 million in alleged back pay in a high-profile, multi-plaintiff wage and hour dispute involving uncompensated "on call" time.  Mr. Litvinov has likewise successfully handled administrative actions before the EEOC, state civil rights agencies, and state labor departments, and enjoys working on administrative and judicial appeals and issues of first impression.  In *Kentucky Restaurant Association, et al. v. Louisville-Jefferson County Metro Government*, Mr. Litvinov saved all Kentucky employers from perpetual increased payroll costs by challenging and defeating an unprecedented local minimum wage ordinance at the Kentucky Supreme Court on behalf of retail and restaurant trade associations.  And in *Collins v. Tyson Foods, Inc.*, Mr. Litvinov set a new precedent throughout Kentucky when he successfully argued that Tyson Foods was shielded from employment discrimination claims relating to its COVID vaccine mandate.

At Smith Krivoshey, in addition to a busy employment practice, Mr. Litvinov has devoted himself to the firm's consumer class action practice.  Mr. Litvinov has handled dozens of class actions for false advertising, product defect and recalls, gambling, and the TCPA.  He is involved in every facet of the firm's litigation practice, working on cases from inception through class resolution.

A graduate of The George Washington University Law School, Mr. Litvinov is admitted in Kentucky and Indiana, and has been permitted to practice in numerous district and circuit courts around the United States. He is a member of the National Employment Lawyers Association, and the Employment Law sections of the Kentucky and Indiana Bar Associations.  Mr. Litvinov dedicates time each year to pro bono efforts benefiting workers with workplace issues who are unable to afford counsel.

# Exhibit 2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LUCAS AUSTIN, individually and on behalf
of all others similarly situated,

|  |  |
|---|---|
| *Plaintiff*, | **Civil Action** _____ |
| vs. | |
| SEGWAY, INC., | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

## CLASS ACTION COMPLAINT

Plaintiff, Lucas Austin ("Plaintiff"), individually and on behalf of all others similarly situated, respectfully submits the following Complaint against Defendant, Segway Inc. (Defendant), and alleges upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1. Plaintiff brings this class action lawsuit as an individual who purchased Defendant Segway's Ninebot Max G30P Kick Scooter (hereinafter "Products" or "Scooter") for normal household use.

2. Major retail outlets such as Walmart , Sam's Club, Target, Best Buy and Costco sell the Segway's Max G30P and Max G30LP Kick Scooters. The Scooters can also be purchased online through the Segway's website and on Amazon amongst others.

3. As such, these Scooters are distributed, marketed, and sold by Defendant to consumers across the United States.

4.      Unfortunately, the Products are defective because the folding mechanism on the Scooter can fail causing the handlebar or stem to fold while the Scooter is in use posing a fall hazard to the consumer. According to the CPSC Recall Notice, the Defendant has received numerous reports of users sustaining injuries ranging from abrasions to broken bones[1]. Walmart reports have claims of consumers suffering burn injuries and property damage.

5.      The Recall applies to approximately 200,000 Scooters that were manufactured and sold between January 2020 through March 2025 at prices ranging between $600-$1000 at the time of Recall[2].

6.      The model numbers are Max G30P and Max G30LP. The model numbers are located on the side of the footback on the Scooters.

7.      The Product is defective because the folding mechanism can fail causing the handlebars or stem to fold while the Scooter is in use.  This defect creates a fall hazard.

8.      Other manufacturers formulate, produce, and sell non-defective Scooters with formulations and production methods that do not cause the Products to catch fire, which is evidence that the fire risk inherent with Defendant's Products is demonstrably avoidable.

9.      Feasible alternative formulations, designs, and materials are currently available and were available to Defendants at the time the Products were formulated, designed, and manufactured.

10.      Plaintiff purchased the Product, while lacking the knowledge that the Product could have its handle bars collapse while in use, thus causing serious harm to those who use such Products.

11.      All consumers who purchased the worthless and dangerous Products have suffered

---

[1] https://www.cpsc.gov/Recalls/2025/Segway-Recalls-Segway-Ninebot-Max-G30P-and-Max-

[2] scooters

losses.

12.     As a result of the above losses, Plaintiffs seek damages and equitable remedies on behalf of themselves and the putative class.



(Space left intentionally blank)

**<u>PARTIES</u>**

13.     Plaintiff Lucas Austin is a resident and citizen of Ville Platte, Louisiana. Ville Platte is located in Evangeline Parish.

14.     Defendant Segway Inc. is a US corporation organized and existing under the laws of the State of California with its principal place of business located at 405 E. South Clara Street, Arcadia, CA 91006.  Defendant is a company that is registered to do business in Pennsylvania, and

operates the manufacture and retail of the Product in the State of Pennsylvania, and throughout the United States.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, the relevant portion of which is codified at 28 U.S.C. §1332(d). The aggregated claims of the individual Class Members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which more than two-thirds of the proposed plaintiff class, on the one hand, and Defendant, on the other, are citizens of different states.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

17. Segway sells its products internationally, throughout the United States and within this judicial district. This Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself to this District's jurisdiction and authority, given Defendant's minimum contacts within this District through Defendant's registration to do business in Pennsylvania, extensive marketing, advertising, and sale of the Product throughout this District. See *Mallory v. Norfolk Southern Railway Co.*, 143 S.Ct. 2028, 600 U.S. 122, 216 L.Ed. 815 (2023).

18. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, given that Defendant sells and distributes their Product throughout the United States and within this District.

## FACTUAL ALLEGATIONS

19. On March 20, 2025, the CPSC issued a recall for certain Segway KickScooters,

Models G30P and G30LP due to a fall hazard.

20.     Defendant has received reports of incidents involving the Scooters including reports of 20 injured consumers who hurt themselves when the handlebar/stem of the Scooter collapsed causing the user to fall.

21.     Plaintiff purchased the Product as "new" and intended it for ordinary use.

22.     Plaintiff reports the handle bar area folding during use.

### *Defendants' Misrepresentations and Omissions are Actionable*

23.     Plaintiff bargained for a Product that was safe to use. Defendant's Products were, and are, unsafe. As a result of the risk of falling while using the Scooter, Plaintiff, and all others similarly situated, were deprived the basis of their bargain given that the Defendant sold them a product whose handlebars/stem could collapse during ordinary use. This dangerous fall risk inherent to the Products renders them unmerchantable and unfit for their normal intended use.

24.     The Products are not fit for their intended use by humans as they expose consumers to a fall hazard. Plaintiff is further entitled to damages for the injury sustained in being exposed to such danger, damages related to the Defendants' conduct, and injunctive relief.

25.     Plaintiff seeks to recover damages because the Products are adulterated, defective, worthless, and unfit for human use due to the risk of catching fire.

26.     The Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its omissions surrounding the risk of catching fire affecting the Products.

27.     Indeed, no reasonable consumer, including Plaintiffs, would have purchased the Products had they known of the material omissions of material facts regarding the possibility of the Products overheating and catching on fire.

28.     Plaintiff bought their Segway Scooters for personal use.

29.     Plaintiff intended to purchase a Product that would be safe for normal use but instead was sold a product that posed a danger of collapsing and injuring the user.

30.     If Plaintiff had been aware of the risk of injury in using the Scooters, they would not have purchased the Product or would have paid significantly less.

31.     As a result of the Defendant's actions, Plaintiff has incurred damages.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action on behalf of himself and as a class action for all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the class and subclass are defined as follows:

**Nationwide Class:** All persons within the United States who purchased Segway's Max G30P or Max G30LP within the statute of limitations.

**Pennsylvania Subclass:** All persons within the State of Pennsylvania who purchased Segway's Max G30P or Max G30LP within the statute of limitations.

33.     Together, the Nationwide Class and Pennsylvania Subclass will be collectively referred to as the "Class" or "Classes." Members of these Classes will be referred to as "Class Members."

34.     Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicate that the Class definitions should be narrowed, expanded, or otherwise modified.

35.     Excluded from the Class and Sub-classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, and judicial officers and their immediate family members and

associated court staff assigned to this case.

36.     The particular members of the Class are capable of being described without difficult managerial or administrative problems. The members of the putative classes are also readily identifiable from the information and records in the possession or control of Defendant or its affiliates and agents and from major retail sellers.

37.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

38.     The proposed Class is so numerous that the joinder of all members is impracticable.

39.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

40.     **Numerosity: Fed. R. Civ. P. 23(a)(1)** – Upon information and belief, the Class is so numerous that the joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information is in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, Electronic Mail, internet postings, social media, and/or published notice.

41.     **Typicality: Fed R. Civ. P. 23(a)(3)** – Plaintiff's claims are typical of the claims of the members of the Class, because, inter alia, all Class Members have been injured through the uniform misconduct described above.  Moreover, Plaintiff's claims are typical of the Class Members' claims because Plaintiff is advancing the same claims and legal theories on behalf of themselves and all members of the Class. In addition, Plaintiff is entitled to relief under the same

causes of action and upon the same facts as the other members of the proposed Class and Sub-class.

42.     **Adequacy: Fed. R. Civ. P. 23(a)(4)** – Plaintiff will fairly and adequately protect the interest of the members of the Class. Plaintiff and the members of the Class were all consumers of a defective product posing an injury hazard.  Plaintiff will fairly and adequately represent and protect the interest of the Class and has retained competent counsel experienced in complex litigation and class action litigation. Plaintiff has no antagonistic interest to those of the Class, and Defendant has no defenses unique to Plaintiff.

43.     **Predominance and Superiority: Fed. R. Civ. P. 23(b)(3)** – A class action is superior to all other available means for the fair and efficient adjudication of claims of Plaintiff and Class Members. There are questions of law and fact common to all Class Members that predominate over questions affecting only individual Class Members. The damages or other financial detriment suffered by individual Class is relatively small compared to the burden and expense that would be incurred by individual litigation of their claims against Defendant. It would be virtually impossible for a member of the Class, on an individual basis, to obtain effective redress for the wrongs committed against him or her. Further, even if the Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. On the other hand, the class action device provides the benefits of adjudication of these issues in a single proceeding, economics of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

44. Plaintiffs seek monetary damages, including compensatory damages on behalf of the Class, and other equitable relief on grounds generally applicable to the entire Class, to enjoin and prevent Defendants from engaging in the acts described. Unless a Class is certified, Defendant will be allowed to profit from its unfair and unlawful practices, while Plaintiff and the members of the Class will have suffered damages. Unless a Class-wide injunction is issued, Defendant may continue to benefit from these alleged violations, and the members of the Class a may continue to be unfairly treated making final injunctive relief appropriate with respect to the Class as a whole.

45. **Common Questions of Fact and Law: Fed. R. Civ. P. 23(b)(4)** – This action involves questions of law and fact common to the Classes. The common legal and factual questions include, but are not limited to, the following:

    a. Whether Defendant negligently failed to exercise reasonable care in the formulation, design, manufacturing, promotion, marketing, advertising, packaging, labeling, distribution, and/or sale of the Product;

    b. Whether Defendant sold the defective Product, that were unreasonably dangerous to consumers such as Plaintiff and members of the Class;

    c. Whether Defendant failed to adequately warn Plaintiff and the Class of the dangers with respect to the defective Product;

    d. Whether Defendant was negligent for failure to warn;

    e. Whether Plaintiff and the Class suffered Damages as a result of the defective Product;

    f. Whether Defendant was negligent for failure to test;

    g. Whether Defendant's advertising, merchandising, and promotional materials directed to Plaintiff were deceptive regarding the risks posed by Defendant's Product;

    h. Whether Defendant made representations regarding the safety of the Product;

    i.        Whether Defendant omitted material information regarding the safety of the Product;

    j.        Whether Defendant's Product was merchantable;

    k.        Whether Defendant violated the consumer protection statutes invoked herein;

    l.        Whether Defendant's conduct alleged herein was fraudulent; and

    m.        Whether Defendant was unjustly enriched by sales of the Products

## CAUSES OF ACTION

### COUNT I

### UNJUST ENRICHMENT

46.      Plaintiff incorporates the allegations set forth in previous Paragraphs as though set forth fully herein.

47.      Plaintiff brings this claim against Defendant on behalf of themselves and the other Members of the Classes.

48.      Plaintiff, and the other members of the Classes, conferred a monetary benefit upon Defendant by purchasing the defective Scooters either directly or through major online or in-person retail outlets. These payments were not gifts or donations but were made in exchange for products that were falsely represented as safe and reliable.

49.      Defendant voluntarily accepted and retained these benefits. Defendant manufactured, marketed and distributed the defective Scooters without adequate warnings of the known defect.

50.      The benefit was obtained unlawfully by Defendant distributing a Product prone to having the handlebars/ stem collapse during ordinary use. Retaining these profits without disclosing the defect or refunding consumers is unjust and inequitable.

51.      The Defendant received revenues from the sales of these defective Scooters at the

expense of Plaintiff and the Class, who would not have purchased the Scooters had they been aware of the defect. The labeling and marketing of the Products by Defendants were misleading and caused direct economic harm and risk of injury to Plaintiff and the Class.

52. Defendant has been unjustly enriched by retaining the revenues derived from the sales of Scooters with defective handles. Retention of these revenues is inequitable because Defendant failed to disclose the known risks associated with their products, thereby misleading consumers and endangering their safety.

53. Plaintiff and the members of the Classes seek restitution of the monies conferred upon Defendant as a result of their unjust enrichment. Defendant should be required to disgorge the profits obtained from the sale of Scooters equipped with defective handlebars and, as such, seek restitution to Plaintiffs and the Classes, as ordered by the Court.

## COUNT II
### BREACH OF EXPRESS WARRANTY

54. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

55. Plaintiff brings this claim against Defendant on behalf of himself and the other Members of the Nationwide (the "Class").

56. Plaintiff and each Member of the Class formed a contract with Defendant at the time they purchased the Products.

57. The terms of the contract included express warranties created by Defendant through affirmative representations, advertising, packaging, labeling, and marketing of the defective Scooters.

58. Defendant, through these marketing and advertising efforts, expressly warranted

that the Products were safe, effective, and fit for their intended purpose. These warranties became part of the basis of the bargain between Plaintiff, Class Members, and Defendant.

59. Defendant made these affirmations of quality and safety through product labeling, packaging, and marketing materials. Defendant reinforced and relied upon these warranties by advertising, displaying, and selling the Products to consumers, thereby making its own express representations of the Products' safety and fitness.

60. Plaintiff and the Class Members fulfilled all conditions precedent to Defendant's liability under this contract, including purchasing the Products in reliance on Defendant's representations.

61. Defendant breached its express warranties because the Products were defective, prone to having the handlebars collapse, and presented a serious fall hazard contrary to their representations. The Products failed to conform to the express affirmations and promises made by the Defendant.

62. Plaintiff and Class Members would not have purchased the Products had they known the true nature of the risks, including the potential for fire hazards and injuries.

63. As a direct and proximate result of Defendant's breach of express warranty, Plaintiff and Class Members suffered and continue to suffer financial damages, injury, and economic losses. They are entitled to compensatory damages, attorneys fees, interest, and any other relief deemed appropriate by the Court.

## COUNT III

### BREACH OF IMPLIED WARRANTY

64. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though

set forth fully herein.

65. Plaintiff brings this claim against Defendants on behalf of himself and the other Members of the Classes.

66. Defendant is a merchant engaged in the business of manufacturing, distributing, warranting, and/or selling the Products.

67. The Products are goods under the relevant laws, and at all times relevant, Defendant knew or had reason to know of the specific use for which these Products were purchased.

68. Defendant entered into agreements with retailers to distribute and sell the Products to consumers, including Plaintiff and Class Members, for personal and household use.

69. The implied warranty of merchantability, which applies to all sales of goods, means that Defendant warranted that the Products were fit for their ordinary purpose-- namely, to safely provide Scooters without posing unreasonable risks of harm.

70. However, Defendant breached the implied warranty of merchantability because the Products were defective, not fit for their intended use, and posed a risk of having the handlebars collapse during ordinary use creating a fall hazard. As a result, they were unfit for their ordinary purpose of safe transportation.

71. This implied warranty applies to all purchasers of the Products, including Plaintiff and Class Members, because they reasonably relied on Defendant's status as merchants and sellers of safe, functional goods.

72. Privity of contract is not required, as Plaintiff and Class Members are the intended beneficiaries of Defendant's implied warranties. Defendant's warranties were created for the benefit of consumers, including Plaintiff and Class Members.

73. Defendant was on notice of the defects through consumer complaints, reports of the Product collapsing during use and the recall of the Products, yet failed to address these defects before selling the Products to consumers.

74. Had Plaintiff, Class Members, and other consumers known that the Products posed an risk of collapsing and injury during use, they would not have purchased them or would have paid significantly less.

75. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff and Class Members suffered and continue to suffer financial harm, injury, and other damages. Plaintiff and the Classes seek all available damages, including compensatory damages, attorneys' fees, interest, and any other relief deemed appropriate by the Court.

<u>**COUNT IV**</u>
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

69. Plaintiff incorporates the allegations set forth in previous Paragraphs as though set forth fully herein.

70. Plaintiff brings this claim against Defendant on behalf of themselves and the other Members of the Classes.

71. Defendant is a merchant engaged in the sale of goods, including the defective Scooters, to Plaintiff and the Class.

72. There was a sale of goods from Defendant to Plaintiff and Class Members, thereby establishing a commercial relationship between Defendant and consumers.

73. As the developer, manufacturer, marketer, distributor, and seller of the defective Products, Defendant impliedly warranted that the Products were merchantable and fit for their

intended use.

74. However, contrary to these representations, the Products were defective and unfit for their ordinary use, as they posed a significant risk of having the handlebars collapse while being used, which was not disclosed to consumers at the time of sale.

75. Defendant breached the implied warranty of merchantability by selling products that were inherently defective and not suitable for their ordinary and intended purpose.

76. Defendant was on notice of this breach, was aware of adverse health and safety risks caused by the handlebars collapsing yet failed to take corrective action before selling the Products.

77. Plaintiff and Class Members did not receive the goods as bargained for, as the Products were not merchantable, did not conform to industry standards, and failed to meet the quality and safety expectations of similar goods.

78. Plaintiff and Class Members are intended beneficiaries of the implied warranties, as they reasonably relied on Defendant's expertise and reputation as merchants when purchasing the Products.

79. Plaintiff and Class Members did not alter the Products, and they used them in the ordinary and intended manner.

80. The Products were defective at the time they left the exclusive control of Defendant, meaning that Defendant bears responsibility for the defect.

81. The Products were defectively designed and/or manufactured, making them unfit for their intended purpose and rendering them non-merchantable under applicable laws.

82. Plaintiff and Class Members purchased the Products without knowing of the latent defect, which was undiscoverable at the time of purchase but existed when the Products left

Defendant's control.

83.     As a direct and proximate result of the defective Products, Plaintiff and Class Members suffered damages, including, but not limited to, the cost of purchasing the defective Product, loss of use, and other related damages.

84.     Defendant attempted to limit or disclaim their implied warranties, but any such disclaimers are unenforceable and void, as a product that poses safety risks cannot be lawfully sold under the implied warranty of merchantability.

85.     Plaintiff and Class Members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, and all costs and attorneys' fees available under law.

## COUNT V

### FRAUDULENT CONCEALMENT

86.     Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

87.     Plaintiff brings this claim against Defendant on behalf of himself and the other Members of the Nationwide Class (the "Class").

88.     Defendant had a duty to disclose material facts to Plaintiff and Class Members given their relationship as contracting parties and intended users of the Products.

89.     Defendant had superior knowledge about the defective nature of the product at issue, particularly the risk of overheating and catching fire, which made them unfit for ordinary use.

90.     During this time, Plaintiff and Class Members were using the Products without

knowing of these fire risks, reasonably believing that the Products were safe for use.

91.     Defendant knew or should have known about the defect but failed to warn consumers, retailers, or regulators, and continued to sell the Product despite the defect, and either knew or should have known about the risk, particularly if the recall had already been issued.

92.     Defendant failed to disclose these material facts with the intent to induce consumers into purchasing the Products, despite the latent defect. This failure constitutes fraudulent concealment as Defendant intentionally withheld critical safety information that, if disclosed, would have affected consumer purchasing decisions.

93.     Plaintiff and Class Members reasonably relied on Defendant's failure to disclose, believing that the Products were safe when, in fact, they were not.

94.     Had Plaintiff and Class Members known the true risks, they would not have purchased the Products or would have paid significantly less.

95.     As a direct and proximate result of Defendant's fraudulent concealment, Plaintiff and Class Members suffered financial losses, including the cost of purchasing defective Products, the risk of harm, and the devaluation of their purchases.

96.     Because Defendant acted with willful and malicious intent, punitive damages are warranted to deter future misconduct and punish Defendants for knowingly concealing critical safety information from consumers.

## COUNT VI
### STRICT LIABILITY – FAILURE TO WARN

97.     Plaintiff incorporates the allegations set forth in previous Paragraphs as though set forth fully herein.

98.     Plaintiff brings this claim against Defendant on behalf of himself and the other

Members of the Classes.

99. Defendant had a duty to warn Plaintiff and Class Members about the Defect and the true risks associated with the Products.

100. As the manufacturer, Defendant was in a superior position to know about the defective Products and their dangerous propensity to have the handlebars collapse. However, Defendant failed to warn consumers, retailers, and regulatory agencies about the risks when it had the opportunity to do so.

101. Defendant failed to provide adequate warnings regarding the risks of the Products before or at the time of sale, particularly if it continued selling the Products despite knowledge of the recall or other safety concerns.

102. Defendants had access to critical safety information regarding the fall hazards associated with the Products, yet failed to warn Plaintiff and Class Members, leaving them unaware of the dangers.

103. Despite knowing the risks, Defendant did not strengthen their warnings or provide adequate safety disclosures before selling the Products. Instead, Defendant actively concealed or ignored the need for stronger warnings, prioritizing sales over consumer safety.

104. Plaintiff and Class Members would not have purchased, chosen, or paid for the Products had they known of the risk of a fall hazard during ordinary use caused by collapsing handlebars. Because Defendant failed to provide proper warnings, consumers were deprived of their right to make an informed purchasing decision.

105. The Defect proximately caused Plaintiff's and Class Members' damages, as they purchased and used a Product that posed an unreasonable risk of harm without their knowledge.

106. Plaintiff and Class Members have suffered damages in an amount to be determined

at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, and all costs and attorneys' fees available under law.

## COUNT VII

### STRICT LIABILITY – DESIGN DEFECT

107. Plaintiff incorporates the allegations set forth in previous Paragraphs as though set forth fully herein.

108. Plaintiff brings this claim against Defendant on behalf of himself and the other Members of the Classes.

109. The design of the recalled Segway Scooters was defective and unreasonably dangerous, making the Products unsafe for consumer use.

110. The risk of falling because of a handlebar defect while Plaintiff and Class Members used the Products caused exposure to known fall hazard and posed a serious risk of injury.

111. The design defect rendered the Products not reasonably fit, suitable, or safe for their intended purpose, violating consumer safety expectations.

112. The risk of a fall hazard outweighed the benefits of the Products, making them unreasonably dangerous to consumers.

113. There were alternatives, safer Scooter designs available, including other Scooters that did not have collapsing handlebars or pose a similar fall risk, meaning Defendant had the ability to manufacture a safer product, but failed to do so.

114. Defendant could have implemented safer design modifications that would have reduced or eliminated the fire risk, such as improved thermal management systems, enhanced safety circuits, or better casing materials, but failed to do so.

115. Because the Products were unreasonably unsafe and did not perform as an ordinary

consumer would expect, they should not have been sold to consumers.

116. Defendant is strictly liable for selling the defective Product, as strict liability applies to all entities in the chain of distribution.

117. Plaintiff and Class Members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, and all costs and attorneys' fees available under law.

## COUNT VIII
### NEGLIGENT FAILURE TO WARN

118. Plaintiff incorporates the allegations set forth in previous Paragraphs as though set forth fully herein.

119. Plaintiff brings this claim against Defendant on behalf of himself and the other Members of the Classes.

120. Defendant owed Plaintiff and Class Members a duty of care to warn of any risks associated with the Products.

121. Defendant knew or should have known that the defective product posed a significant fall risk associated with collapsing or folding handlebars, but failed to warn Plaintiffs and Class Members.

122. Defendant had a duty to warn consumers if it had knowledge or reason to know about the defect including through prior consumer complaints, product recalls, or other safety notices, but failed to provide adequate warnings before or at the time of sale.

123. Plaintiff and Class Members had no way of knowing about the Product's latent defect, as an ordinary consumer would not expect the Product's handlebar/stem to fold under normal use.

124. Defendant's breach of its duty to warn caused Plaintiff and Class Members to suffer economic damages and physical injuries.

125. Plaintiff and Class Members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees available under law.

**COUNT IX**

**NEGLIGENT DESIGN DEFECT**

126. Plaintiff incorporates the allegations set forth in previous Paragraphs as though set forth fully herein.

127. Plaintiff brings this claim against Defendant on behalf of themselves and the other Members of the Nationwide Class (the "Class").

128. Defendant owed Plaintiff and Class Members a duty of care to design, manufacture, and sell products that were safe for their intended use.

129. The design of the recalled Segway Scooters was defective and unreasonably dangerous, causing the risk of severe injury to the user.

130. The design of the Products rendered them unfit, unsuitable, and unsafe for their intended purpose, as the fall hazard far outweighed any benefits of the Product.

131. There were alternative, safer Scooter designs available that did not have the handlebar/stem fold during ordinary use, meaning Defendant could have implemented a safer design but failed to do so.

132. Defendant had access to industry knowledge, safety reports, and consumer complaints that should have alerted them to the defective nature of the Products.

133. Defendant was negligent in selling the defective Products, as they either knew or

should have known that the design was unreasonably dangerous, particularly if the recall had been issued or customer complaints had been received before further sales.

134. The negligent design of the Product was the proximate cause of Plaintiff's and Class Members' damages, as it posed an inherent and foreseeable risk of harm that Defendant failed to address.

135. Plaintiffs and Class Members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, and all costs and attorneys' fees available under law.

## COUNT X
### NEGLIGENCE

136. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

137. Plaintiff brings this claim against Defendant on behalf of himself and the other Members of the Classes.

138. Defendant owed a duty of care to consumers to design, manufacture, distribute, and sell products that were reasonably safe for their intended use.

139. Defendant breached this duty by producing and selling a product that was defective, unreasonably dangerous, and unfit for its intended purpose. The model numbers identified in the recall have handlebars and stem that can fold during ordinary use and create a fall hazard.

140. Defendant failed to properly design and test the product to ensure its safety before placing it into the stream of commerce, and negligently sold the product without proper warnings, quality assurance measures, or recalls, despite the known risks.

141. Defendant knew or should have known that the Scooters had a significant risk of having the handlebars or stem fold yet failed to take reasonable steps to prevent foreseeable harm

to consumers.

142. As a direct and proximate result of Defendant's negligence, Plaintiff suffered economic damages, injuries, and deprivation of the benefit of the bargain, as the product did not perform as reasonably expected and was unsafe for use.

143. Further, Defendant's negligence directly caused harm to Plaintiff and Class Members, as it was foreseeable that a poorly designed and untested Scooters would have the handlebars or stem fold and cause injury. It was also foreseeable that consumers would lose the benefit of their purchase if they received a defective and worthless product.

144. Plaintiff and Class Members suffered damages in an amount to be determined at trial and Plaintiffs and Class Members are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law.

## COUNT XI

**Violation of the Pennsylvania Unfair Trade Practice and Consumer Protection Law**

**(PUTPCPL) (73 Pa Stat 201)**

(On Behalf of Plaintiff and Subclass)

145. Plaintiff incorporates all prior Paragraphs as if fully set forth herein.

146. Plaintiff brings this count on behalf of himself and the Classes.

147. Defendant engaged in unfair or deceptive acts or practices in violation of the PUTPCPL by knowingly misrepresenting, omitting, or concealing material facts in connection with the sale of the defective Scooters.

148. Defendant also engaged in deceptive trade practices in violation of the PUTPCPL by making false statements, failing to disclose material facts, and engaging in unfair

business practices that caused Plaintiff harm.

149. Defendant's conduct included false or misleading statements regarding the quality, effectiveness, and nature of the Scooters, which a reasonable consumer would rely upon in making a purchase decision.

150. Defendant engaged in a course of conduct that was likely to mislead consumers, including Plaintiff, about the true characteristics of the product.

151. Defendant knowingly and intentionally deceived consumers by advertising, marketing, and selling the products under false pretenses.

152. Defendant's conduct was unfair, oppressive, and substantially injurious to consumers, creating an unfair advantage over law-abiding competitors.

153. Defendant engaged in, and continues to engage in, the above-reference deceptive acts and unfair trade practices in the conduct of business, trade, and commerce, including by omitting material facts regarding the handlebars and the danger of collapse within its Product.

154. Plaintiff relied on Defendant's deceptive acts, unfair trade practices, and omissions, which are described above. Plaintiff has suffered injury in fact and lost money as a result of Defendant's unlawful, unfair, and fraudulent practices.

155. Defendant's wrongful conduct caused Plaintiff and the Classes to suffer an ascertainable loss by causing them to incur substantial expense in purchasing Defendant's Product which they reasonably believed was safe to use as intended. Plaintiff and the Classes have suffered an ascertainable loss by receiving other than what was promised.

156. Plaintiff and the Class Members would not have purchased the Product at issue, or would have paid less, had they known the truth about the Product.

157. If Defendant had not sold its Product that contained falsely advertised information, Plaintiff and the Class Members would not have suffered the extent of damages caused by Defendant's sales.

158. As a direct and proximate result of Defendant's business practices, Plaintiff and the Class Members suffered injury in fact and lost money or property because they purchased and paid for products they otherwise would not have. Plaintiff and the Class Members are entitled to injunctive relief and attorneys' fees and costs.

159. Pursuant to the PUTPCPL, Plaintiff and the Class Members seek an order of this Court requiring Defendant to disgorge all ill-gotten gains and awarding Plaintiff and the Class Members full restitution of all monies wrongfully acquired by it by means of such "unlawful" and "unfair" conduct, so as to restore any and all monies to Plaintiff and the Class Members which were acquired and obtained by such "unlawful" and "unfair" conduct, and which ill-gotten gains are still retained by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Members of the Class alleged herein, respectfully request that the Court enter judgment in their favor and against the Defendant as follows:

A. For an order certifying the Class and naming Plaintiff as the representative for the Class and Plaintiffs' attorneys as Class Counsel;

B. For an order declaring that Defendant's conduct violates the causes of action referenced herein;

C. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.  For prejudgment interest on all amounts awarded;

F.  For an order of restitution and all other forms of equitable monetary relief;

G.  For injunctive relief as pleaded or as the Court may deem proper;

H.  For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

I.  For an order providing for all other such equitable relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of all those similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

Dated: April 4, 2025

By: */s/ Stuart A. Carpey*

**CARPEY LAW, P.C.**
Stuart A. Carpey
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
Tel: 610-834-6030
Fax: 610-825-7579
scarpey@carpeylaw.com
*Attorneys for Plaintiff and Putative Class*

# Exhibit 3

**KAPLAN FOX & KILSHEIMER LLP**
Justin B. Farar (SBN 211556)
12400 Wilshire Boulevard, Suite 910
Los Angeles, CA 90025
Telephone: 310-614-7260
Facsimile: 310-614-7260
Email: *jfarar@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
Clarissa R. Olivares (SBN 343455)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: *lking@kaplanfox.com*
        *mgeorge@kaplanfox.com*
        *breed@kaplanfox.com*
        *colivares@kaplanfox.com*
*Attorneys for Plaintiff Paul Hanson and the*
*Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL HANSON, individually and on behalf of all others similarly situated, | Case No. 2:25-cv-03305 |
| Plaintiff, | **CLASS ACTION** |
| v. | **<u>CLASS ACTION COMPLAINT</u>** |
| SEGWAY INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Paul Hanson ("Plaintiff"), by his undersigned counsel, on behalf of himself and a Class of those similarly situated, brings this action against Defendant Segway, Inc., and alleges based upon personal knowledge of the allegations pertaining to himself, and upon information, belief, and the investigation of counsel as to all other allegations.

**INTRODUCTION**

1. Defendant Segway, Inc. ("Segway" or "Defendant") manufactures and sells a variety of expensive, luxury e-scooters and other forms of mechanized transit.

2. From January 2020 through February 2025, Defendant sold approximately 220,000 Segway Ninebot Max 30p and Max G30LP Kickscooters (the "E-Scooters") for between $600 and $1,000.

3. Unfortunately, these expensive E-Scooters contain a dangerous defect in their folding mechanism, such that the handlebars of the E-Scooter can fold and collapse while in use, sometimes flinging consumers off the E-Scooter at high speeds (the "Defect"). Specifically, the folding mechanism's Defect causes the E-Scooter's stem leading to the handlebars to become progressively looser with use.

4. As a result of the Defect, Defendant has received "68 reports of folding mechanism failures, including 20 injuries to include abrasions, bruises, lacerations and broken bones."[1]

5. Unsurprisingly, Defendant and the U.S. Consumer Product Safety Commission ("CPSC") announced on March 20, 2025, a recall of approximately 220,000 E-Scooters manufactured with a defective folding mechanism (the "Recall").

6. As part of the Recall, consumers have been advised to "immediately stop using the recalled [S]cooters" to avoid injury from the dangerous Defect.[2]

---

[1] https://www.cpsc.gov/Recalls/2025/Segway-Recalls-Segway-Ninebot-Max-G30P-and-Max-G30LP-KickScooters-Due-to-Fall-Hazard-and-Risk-of-Serious-Injury ("CPSC Recall Page"), *last accessed* April 10, 2025.
[2] *Id.*

7. Moreover, the Recall itself is entirely inadequate. As an initial matter, it provides no monetary remedy whatsoever. Rather than actually recalling and refunding or replacing the unsafe E-Scooters, Defendant instead offers only to send consumers a "free maintenance kit" "include[ing] tools and instructions for checking and tightening the folding mechanism and keeping it properly maintained" (the "Maintenance Kit").

8. Defendant's Recall process requires consumers to contact Defendant to request the promised Maintenance Kit, but does not inform consumers when they can expect their Maintenance Kit to arrive.

9. And when the Maintenance Kit does arrive, consumers must attempt to tighten the old, defective folding mechanism on their own, even if they lack the required skills.

10. Given the nature of the Defect, the Recall Defendant offers in no way remedies the danger posed to consumers, as it does not rectify the *cause* of the Defect. Consumers are not offered a new, safe E-Scooter without the Defect. Instead, they must use the Maintenance Kit to inspect the defective folding mechanism, attempt to secure it, and hope they did a sufficient job so that the E-Scooter does not collapse while they try to use the product, even at the E-Scooter's top speed of 18.6 miles per hour.[3]

11. They then must constantly monitor the E-Scooter for future manifestations of the Defect.

12. In addition to the Recall process being unduly burdensome on consumers and offering an inadequate remedy, the notice element of the Recall is also inadequate. There is a significant likelihood that the majority of consumers who purchased or who currently own a Segway E-Scooter will never learn of the Recall.

---

[3] https://store.segway.com/ninebot-kickscooter-max-g30lp ("Ninebot KickScooter MAX G30LP Promotional Page"), *last accessed* April 10, 2025.

13. This is a dangerous Defect which Defendant knew of or should have known and warned customers about, and which has been experienced and reported by disappointed consumers firsthand after the point of sale. No reasonable consumer would purchase an expensive Segway E-Scooter—a product intended to safely and reliably transport consumers whether commuting or enjoying a recreational scooter ride—that has a serious safety Defect that could cause consumers to fall mid-ride or even be flung off the E-Scooter at high speeds, potentially sustaining serious injuries.

14. Additionally, while there is a significant resale market for used E-Scooter, the defective, recalled Segway E-Scooters in this case have experienced a significant loss in value and useful life because of these issues.

15. This is not the first recall Defendant has been forced to issue due to manufacturing and selling a defective product. In November 2024, due to a *near-identical* defect in a different model e-scooter, Defendant recalled approximately 1,400 Segway Ninebot P100 KickScooters ("P100 E-Scooters") after 31 reports of defective front fork. Similar to the E-Scooters at issue here, the P100 E-Scooter had a stem that could "break, posing fall and injury hazards to the rider."[4] This defect caused consumers to fall or be flung from the scooter, with 6 reported injuries.[5] Defendant has therefore been put on additional notice of the danger posed by manufacturing and distributing defective products—including with this particular Defect.

16. For these and the additional reasons described herein, the utility of Defendant's conduct in designing, manufacturing, and selling the E-Scooters is outweighed by the gravity of the consequences to Plaintiff and Class Members. Moreover, Defendant's conduct as described in this Complaint is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiff and Class Members.

---

[4] https://www.cpsc.gov/Recalls/2025/Segway-Recalls-Segway-Ninebot-P100-KickScooters-Due-to-Fall-and-Injury-Hazards

[5] *Id.*

- 3 -
Case No. 2:25-cv-03305
CLASS ACTION COMPLAINT

17.     Through this suit, Plaintiff requests a full refund and/or applicable damages on these dangerous E-Scooters, as well as all other appropriate relief.

## PARTIES

18.     Plaintiff Paul Hanson is currently a resident of Arizona who purchased a Segway Max G30LP Kickscooter E-Scooter from Amazon on July 3, 2021, for $905.26.

19.     At the time of this purchase, Mr. Hanson resided in Washington state.

20.     Defendant Segway Inc. is a corporation registered in Wilmington, Delaware with its principal place of business in California located at 405 E Santa Clara St., Arcadia, CA 91006.

## JURISDICTION

21.     This Court has personal jurisdiction over the Defendant. The Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d). Defendant has transacted business and affairs in California and has committed the acts complained of in California. The amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and this case is a class action in which some members of the Class and Subclasses are citizens of different states than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district. Defendant has maintained its U.S. headquarters in this district, transacted business and affairs in this district, and has committed the acts or omissions complained of in this district.

## FACTUAL ALLEGATIONS

### A.  Segway's E-Scooter and Representations

23.  Segway designs, manufactures, markets, and sells a variety of powersport vehicles, e-bikes, e-scooters and other products throughout the United States of America.

24.  The Segway E-Scooters at issue in this lawsuit are sold on the Segway website and various retailers, including Amazon, Wal-Mart, and Costco, among others. For example, Segway sells the Ninebot Kickscooter Max G30P—one of the E-Scooters at issue—on its website for a sale price of $549.99.[6] The CPSC notes that the E-Scooters at issue were sold for between $600-$1000.[7]



25.  Segway proclaims itself to be the "global leader"[8] in consumer robotics and proudly advertises that they are the "number one brand in electric Kickscooter sales."[9]

---

[6] https://store.segway.com/ninebot-kickscooter-max ("Ninebot Kickscooter MAX Promotional Page"), *last accessed* April 10, 2025.

[7] CPSC Recall Page.

[8] https://www.segway.com/explore/about-us.html#:~:text=Segway%2DNinebot%20is%20a%20global,in%20self%2Dbalancing%20personal%20transporters, *last accessed* April 10, 2025.

[9] https://www.instagram.com/p/DEk1gqKONTv/, *last accessed* April 10, 2025.

26. Defendant markets the Segway E-Scooters at issue as a convenient mode of transportation "perfect for smooth, safe rides."[10] Defendant's promotional images consist of adventurous people traversing on the Segway E-Scooters, or the E-Scooters safely carrying riders across various urban terrains and inclines.[11]

27. On its website, Defendant describes the defective folding mechanism as





a "quick folding system" to fold the E-Scooters, making the E-Scooters portable and easy to carry or store. Defendant claims that it is designed to "take to any destination

---

[10] Ninebot Kickscooter MAX Promotional Page.
[11] *Id.*

you desire effortlessly" and, because it is the same "folding mechanism of [] high-end folding bikes, it is safe and durable."[12]



**Classic Quick Folding System**

Ninebot KickScooter MAX G30LP can be folded with ease in a mere 3 clicks. It is easy to carry on public transportation, store in your car, and take to any destination you desire effortlessly. Also, equipped with the folding mechanism of the high-end folding bikes, it is safe and durable.

28.      Defendant also promotes that the E-Scooters can safely carry riders at a top speed of 18.6 miles per hour through various terrain.[13] The dangerous nature of this Defect becomes clear when one imagines zipping down the bike lane at over 15 miles per hour on an unprotected electric scooter, only to have the supposedly reliable handlebars suddenly collapse.

**B.      The E-Scooters' Defect and Recall**

29.      On March 20, 2025, Defendant and the CPSC recalled approximately 220,000 E-Scooters designed and sold between January 2020 through February 2025

---

[12] *Id.*

[13] Ninebot Kickscooter MAX Promotional Page.

following 68 reports of "folding mechanism failures" including 20 injuries "including abrasions, bruises, lacerations, and broken bones."[14]

30. According to the Recall Notice, the E-Scooters were designed with a dangerously defective folding mechanism. Due to this defect, the stem leading to the handlebars of the E-Scooters can suddenly come loose, fold, and collapse inward while in use, causing riders to fall or be flung from the E-Scooters, potentially when riding at top speeds.[15]

31. The Recall advises consumers to "immediately stop using the recalled scooters" and to contact Segway to "receive a free maintenance kit" to tighten the defective folding mechanism and "keep it properly maintained," requiring consumers to constantly monitor their expensive E-Scooters for manifestation of the dangerous Defect.[16]

32. Put differently, despite Defendant's representations and images of a safe, reliable, convenient and portable e-scooter, the E-Scooters in question do not meet the bare minimum standards of operating with the usual and expected level of safety due to the Defect in the E-Scooter's design that can suddenly fold and collapse while in use, causing riders to fall and sustain serious injuries.

33. This is an extremely dangerous Defect—the Segway E-Scooters' folding mechanism can fold and collapse on consumers while in normal use, sometimes causing significant injury.

34. The Defect is a manufacturing defect present in all Segway Ninebot MAX G30P and G30LP E-Scooters sold at the time outlined by the Recall.

35. The E-Scooters do not display any warning of the dangers posed by the Defect. Nor did Defendant disclose the Defect in any other customer-facing communication in the timeframe outlined in the Recall.

---

[14] CPSC Recall Page.

[15] *Id.*

[16] *Id.*

36. The Defect renders the E-Scooters unfit for the ordinary purpose of providing a safe and reliable mode of transportation because it exposes consumers to the risk of significant physical harm while in regular use.

37. Plaintiff and Class Members would not have bought the Segway E-Scooters, or would not have bought them on the same terms, if the Defect had been disclosed.

38. Accordingly, Plaintiff and Class Members suffered an economic loss at the moment of their purchase of the Defective E-Scooters in the form of overpayment and diminution in value.

39. The Recall does not make Plaintiff and Class Members whole, as it fails to cure this economic loss stemming from the Defective folding mechanism on the E-Scooters at issue. Plaintiff and Class Members would not have purchased a $600-$1000 E-Scooter they knew could collapse from beneath them and cause serious injury while in ordinary use.

40. The Recall provides consumers with no monetary relief whatsoever; to the contrary, Defendant explicitly states that "[n]o returns or replacements are involved."[17]

41. Instead of providing a refund or replacement e-scooter, Defendant's Recall requires consumers to contact Defendant so that they may "determine whether the folding mechanism needs adjustment," and, if the consumer's E-Scooter is deemed needy, Defendant will then provide a Maintenance Kit, to "include tools and instructions for checking and tightening the folding mechanism and keeping it properly maintained."

42. In other words, Segway does not even offer to replace the Defective folding mechanism—instead outsourcing its duty to provide a safe and reliable E-

---

[17] https://service.segway.com/us-en/g30RecallNotice, *last accessed* April 10, 2025.

Scooter to consumers who must attempt to use the Maintenance Kit to tighten and repair the original, defective folding mechanism to "keep[] it properly maintained."[18]

43. Because of this, consumers must monitor and repair their expensive E-Scooters as long as they own them to prevent the Defect from manifesting.

44. Further, the Recall does not compensate for the diminished value, including resale value, or loss of use of the E-Scooter, despite the CPSC's warning that "[c]onsumers should immediately stop using the recalled scooters" until they contact Segway and receive the Maintenance Kit.[19]

45. Segway has received complaints of the Defect directly from consumers for years, including on its own website. For example, in a comment dated December 30, 2022, one consumer stated that Segway "[s]old me a scooter with a loose stem which came off while riding. Very dangerous and have yet to send someone to repair."[20]

46. Moreover, Defendant's e-scooters are no stranger to recalls due to falling stems and handlebars.

47. In November 2024, Segway was forced to recall approximately 1,400 Segway P100 E-Scooters after 31 reports of defective front fork. Similar to the E-Scooters at issue here, the P100 E-Scooter had a stem that could "break, posing fall and injury hazards to the rider."[21] This defect caused consumers to fall or be flung from the scooter, with 6 reported injuries.[22]

48. Defendant has therefore been put on additional notice of the danger posed by manufacturing and distributing defective products—including with this particular Defect.

---

[18] *Id.*

[19] *Id.*

[20] https://store.segway.com/ninebot-kickscooter-max, *last accessed* April 11, 2025.

[21] https://www.cpsc.gov/Recalls/2025/Segway-Recalls-Segway-Ninebot-P100-KickScooters-Due-to-Fall-and-Injury-Hazards, *last accessed* April 11, 2025.

[22] *Id.*

49. Through this suit, Plaintiff requests a full refund and/or applicable damages on these dangerous E-Scooters, as well as any other appropriate relief.

## PLAINTIFF'S EXPERIENCES

50. Plaintiff Paul Hanson purchased a Segway Max G30LP Kickscooter E-Scooter from Amazon on July 3, 2021, for $905.26.

51. At the time of this purchase, Mr. Hanson resided in Washington state and took delivery of the E-Scooter in Washington state.

52. Mr. Hanson wanted to purchase a safe, reliable, quality electric scooter from a well-known and recognizable brand.

53. As Segway is arguably the most trusted name in the e-scooter industry, Mr. Hanson felt comfortable trusting Segway to get him safely from when riding it.

54. Unfortunately, Mr. Hanson was instead sold an E-Scooter with a dangerous Defect, as described herein.

55. Mr. Hanson experienced this Defect first-hand and has limited his use of the E-Scooter due to its Defect.

56. Mr. Hanson did not receive formal notice of the Recall from Defendant. Instead, he was informed of the Recall by Amazon. Had Mr. Hanson not purchased the E-Scooter through Amazon, he may have never learned of the Defect and inherent dangers of continuing to ride his E-Scooter.

57. Once learning of the Defect, Mr. Hanson contacted Defendant to receive a Maintenance Kit. Mr. Hanson is now a resident of Arizona, and was residing there Arizona during the Recall. Mr. Hanson received the Maintenance Kit to his home in Arizona.

58. The Maintenance Kit is the only remedy Defendant provides. It is insufficient in several respects.

59. First, the Recall does not actually repair or replace the defective E-Scooter with a non-defective E-Scooter. Instead, consumers with no expertise are expected to examine their E-Scooter, identify the defective folding mechanism,

- 11 -                                                    Case No. 2:25-cv-03305
CLASS ACTION COMPLAINT

tighten it, and continue monitoring and tightening it for the remainder of the E-Scooter's useful life. In Segway's own words: "the folding mechanism may require periodic checks and tightening."[23]

60. Second, the Recall certainly does not remedy the false representations and omissions Segway has made regarding the E-Scooters, which enticed Mr. Hanson to purchase (and overpay for) the E-Scooter in the first place. It does not make Mr. Hanson whole.

61. Further, Mr. Hanson is not experienced in repairing and maintaining electric powersport vehicles like the E-Scooters at issue, and, like many consumers, may be unconfident that he will be able to properly secure the defective folding mechanism so that it may be safe for him or his friends and family to use.

62. Mr. Hanson would not have purchased an E-Scooter, or would have paid less and/or sought materially different terms, had he known these E-Scooters were defective and not as safe as Defendant represented. Defendant's misrepresentations and omission were substantial factors in Plaintiff's decision to purchase the Segway E-Scooter.

## TOLLING

### A. Continuing Act Tolling

63. As the creator, designer, manufacturer, and seller of the E-Scooter, Segway has had actual knowledge likely since at least November 2024, when a different Segway e-scooter was recalled for a near-identical defect,[24] and certainly since consumers began reporting injuries and complaining of the Defect to the CSPS, that the E-Scooter is defectively designed and exposes consumers to risk of injury.

64. Nonetheless, Segway issued the Recall only on March 20, 2025.

65. Thus, at all relevant times, Segway possessed continuous knowledge of the material dangers posed by the E-Scooter, and yet Segway knowingly continued

---

[23] https://service.segway.com/us-en/g30RecallNotice, *last accessed* April 14, 2024.

[24] *See* https://www.cpsc.gov/Recalls/2025/Segway-Recalls-Segway-Ninebot-P100-KickScooters-Due-to-Fall-and-Injury-Hazards.

to allow the sale of the E-Scooter. Plaintiff's and Class Members' claims are not time barred.

66. Moreover, even after the Recall was initiated, there is no evidence that Segway's Recall Notice has reached all owners of the Segway E-Scooters.

67. Plaintiff and Class Members could not have reasonably discovered and could not have known of these facts, which Segway publicly disclosed for the first time mere weeks ago. Indeed, until it issued the Recall, Segway knowingly failed to disclose material information regarding the existence of the Defect in all E-Scooters. Accordingly, no potentially relevant statute of limitations should apply.

**B.     Fraudulent Concealment Tolling**

68. Any applicable statutes of limitations have been tolled or have not run for the additional reason that Segway knowingly, actively, and fraudulently concealed the facts as alleged herein. Segway had actual and constructive knowledge of the dangerous Defect in the Segway E-Scooters since consumers began complaining of injuries to the CSPC.

69. Plaintiff and Class Members have been kept in ignorance of information essential to the pursuit of their claims, and their safety, without any fault or lack of diligence on their part. Segway's concealment of the Defect in the E-Scooter before, during, and after the purchases of Plaintiff's E-Scooter prevented them from being on notice of any facts or information that would have required them to inquire whether Segway fulfilled its duties under the law and, if not, whether Plaintiff and Class Members had legal recourse.

70. At all times prior to, during, and since the purchase of Plaintiff's and Class Members' E-Scooters, Segway has been under a continuing duty to disclose the true facts regarding the safety Defect in the E-Scooter. Because of Segway's willful concealment of material information concerning the E-Scooter over a period of years, Segway is estopped from relying on any statute of limitations defense as to the claims of Plaintiff and Class Members.

## C.     Discovery Rule Tolling

71.     Plaintiff and Class Members could not have discovered through the exercise of reasonable diligence that their E-Scooters were defective within the time period of any applicable statutes of limitation because, as described herein, only Segway had that information, and Segway was concealing that information from the public.

72.     Indeed, Plaintiff only recently became aware of the E-Scooter's dangerous Defect through no fault of his own.

73.     Plaintiff and other Class Members could not have reasonably discovered, and could not have known of facts that would have caused a reasonable person to suspect, that Segway was manufacturing and marketing the E-Scooter despite being aware it contained a dangerous Defect.

74.     As such, no potentially relevant statute of limitations should be applied.

## CLASS ACTION ALLEGATIONS

75.     Pursuant to Rule 23(a), (b)(2), and (b)(3), Plaintiff brings this action on behalf of himself and others similarly situated.

76.     Specifically, Plaintiff seeks to represent a Nationwide Class, defined as: "all persons in the United States who purchased or otherwise own one of the Segway Ninebot MAX G30P and G30LP E-Scooters impacted by the Recall (the "Class")."

77.     In the alternative, Plaintiff seeks to represent Subclasses defined as:

"All persons in the Washington who purchased or otherwise own one of the Segway Ninebot MAX G30P and G30LP E-Scooters impacted by the Recall (the "Washington Subclass")"; and

"All persons in the Arizona who purchased or otherwise own one of the Segway Ninebot MAX G30P and G30LP E-Scooters impacted by the Recall (the "Arizona Subclass")."

78.     Excluded from the Class and Subclasses are (i) each Defendant, any entity in which a Defendant has a controlling interest or which has a controlling

interest in any Defendant, and Defendant's legal representatives, predecessors, successors and assigns; (ii) governmental entities; (iii) Defendant's employees, officers, directors, agents, and representatives and their family members; and (iv) the Judge and staff to whom this case is assigned, and any member of the judge's immediate family.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of the California Consumers Legal Remedies Act
### (Cal. Civ. Code §§1750, *et seq.*)

79. Plaintiff incorporates by reference and re-alleges all prior paragraphs of this complaint as though fully set forth herein.

80. Plaintiff Hanson brings this claim on behalf of himself and the Class.

81. Plaintiff and the Class Members are "consumers" that purchased "goods" in the form of the E-Scooters within the meaning of California Civil Code section 1761.

82. Segway is a "person" within the meaning of California Civil Code section 1761(c).

83. The application of the California Consumer Legal Remedies Act to the putative Class in this action is appropriate because Defendant's wrongful conduct alleged herein, includes but is not limited to Defendant's marketing and sale of defective, unsafe E-Scooter in the state of California, and Segway's unfair and deceptive marketing emanating from its headquarters in Arcadia, California.

84. The California Consumer Legal Remedies Act, Cal. Civ. Code §1770(a)(5) & (7) provide, in part, as follows:

    (a)    The unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful:

. . .

(5)     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have . . .;

. . .

(7)     Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

85.     Segway violated California Consumer Legal Remedies Act, Civil Code section 1770(a)(5), *inter alia*, by representing that the E-Scooter has characteristics, uses or benefits, which it does not have, and/or Civil Code section 1770(a)(7) by representing that the E-Scooter is of a particular standard, quality, or grade, even though it is of another. Such conduct includes, among other things:

a.     Designing, manufacturing, marketing, and selling the E-Scooter consumers from its headquarters in Arcadia, California that contained material, fundamental defects without disclosing such defects to consumers;

b.     Marketing and selling the E-Scooter when it was not merchantable for the purpose of providing safe transportation;

c.     Marketing and selling the E-Scooter while concealing material facts from Plaintiff and Class Members regarding the defects in the E-Scooters that would manifest both within and outside their express or implied warranty periods that would create a safety risk for Plaintiff and Class Members who purchased the E-Scooters to provide safe and reliable mode of transportation;

d.     Concealing from Class Members that Defendant was in breach and intended to breach its warranty obligations as set forth in this complaint.

86.     Concurrently with the filing of the instant Complaint, Plaintiff is sending a CLRA notice of violation and demand letter to Defendant Segway. Upon response, or non-response within thirty (30) days, to this notice, Plaintiff shall file an Amended Complaint to seek monetary relief from Segway to provide actual, compensatory, statutory, and/or punitive damages.

## COUNT II
**Unlawful, Unfair, and Fraudulent Business Acts and Practices**
**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

87.     Plaintiff incorporates by reference and re-alleges all prior paragraphs of this complaint as though fully set forth herein.

88.     Plaintiff Hanson brings this claim on behalf of himself and the Class.

89.     Segway's acts and practices constitute unlawful, unfair, and fraudulent business practices in violation of California's Unfair Competition Law, California Business and Professions Code Section 17200, *et seq.* The application of California's Unfair Competition Law to the putative Class in this action is appropriate because Segway's wrongful conduct alleged herein includes, but is not limited, to Segway's marketing and sale of defective, unsafe E-Scooters in the State of California, and Segway's unfair and deceptive marketing emanating from its headquarters in Arcadia, California.

90.     Defendant engaged in fraudulent, unlawful and unfair business practices in violation of the Unfair Competition Law by, among other things:

a.     Designing, manufacturing, marketing and selling the E-Scooter to consumers from its headquarters in Arcadia, California when it contained material, fundamental defects without disclosing such defects to consumers;

b.     Marketing and selling E-Scooters that were not merchantable for the purpose of providing safe transportation;

c.     Marketing and selling E-Scooters while concealing material facts from Plaintiff and Class Members regarding the defects in the E-Scooters that would manifest both within and outside their express or implied warranty periods that would

create a safety risk for Plaintiff and Class Members who purchased the E-Scooters to provide safe mode of transportation;

> d. Concealing from Class Members that Defendant was in breach and intended to breach its warranty obligations as set forth in this complaint;

> e. Violating additional laws and regulations as set forth herein; and

> f. Breaching its express and implied warranties with Class Members as set forth herein.

91. Defendant also violated the Unfair Competition Law because the utility of its conduct as described in this Complaint is outweighed by the gravity of the consequences to Plaintiff and Class Members and because Defendant's conduct as described in this Complaint is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiff and Class Members.

92. Plaintiff, on behalf of himself and Class Members, has suffered injury in the form of lost money and property, including but not limited to a diminishment in the value and useful life of the E-Scooter, as a direct and proximate result of Defendant's fraudulent, unlawful, and unfair business practices and is therefore entitled to equitable relief, including restitution, disgorgement of profits Defendant obtained from its fraudulent, unlawful and unfair business practices, and a permanent injunction that enjoins Defendant from the unlawful practices described herein, as well as attorneys' fees and costs of suit. Cal. Bus. & Prof. Code § 17203.

## COUNT III
### Violation of California False Advertising Law
### (Cal. Bus. & Prof. Code §§ 17500, *et seq.*)

93. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

94. Plaintiff Hanson brings this claim on behalf of himself and the Class.

95. Each of the deceptive and misleading advertising practices of Defendant set forth above constitutes untrue or misleading advertising under the California False

Advertising Law ("FAL"), California Business & Professions Code section 17500, *et seq.*

96. At all material times, Defendant's statements and marketing and advertising materials misrepresented or omitted material facts regarding the safety of Defendant's E-Scooter as set forth in this Complaint. Defendant is disseminating, from its headquarters in Arcadia, California, statements, marketing and advertising concerning the useability and safety of its E-Scooter that are unfair, untrue, deceptive, or misleading within the meaning of California Business & Professions Code section 17500, *et seq.* Defendant's acts and practices have deceived and/or are likely to continue to deceive Plaintiff, members of the Class, and the public. As set forth above, Defendant's safety and quality claims are deceptive and misleading to reasonable consumers because the folding mechanism on the E-Scooter is defective, making the E-Scooter extremely hazardous as it fails to meet average standards of safety. Moreover, Defendant intentionally does not disclose any of this information to consumers and instead represents that the E-Scooter is beyond average levels of usability and safety.

97. In making and disseminating the statements alleged herein, Defendant knew or should have known its advertisements were deceptive and misleading. Plaintiff and members of the Class based their decisions to purchase and use Defendant's E-Scooter on Defendant's misrepresentations and omissions of material facts.

98. Plaintiff and Class members are entitled to relief, including enjoining Defendant to cease and desist from engaging in the practices described herein, as well as a declaration of rights that Defendant's safety claims are deceptive and misleading.

## COUNT IV
### Violation of the Song-Beverly Consumer Warranty Act
### (Cal. Civ. Code §§ 1790, *et seq.*)

99. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

100. Plaintiff Hanson brings this claim on behalf of himself and the Class.

101. Defendant violated the Song-Beverly Consumer Warranty Act by, among other things, violating the implied warranties of merchantability by knowingly selling defective E-Scooters that are unsuitable for their expected use in violation of sections 1791.1 and 1791.2, and were therefore not fit for the ordinary purpose for which the goods were intended to be sold.

102. Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

103. Plaintiff seeks restitution and damages as a result of Defendant's unlawful conduct, as well as attorneys' fees and costs of suit.

## COUNT V
### Violation of the Washington Consumer Protection Act
#### (Wash. Rev. Code §§ 19.86.10, *et seq.*)
#### (On behalf of the Washington Subclass)

104. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

105. Plaintiff Hanson brings this claim on behalf of himself and the Washington Subclass.

106. Defendant is a "person" within the meaning of the Washington Consumer Protection Act ("WCPA") § 19.86.010(1), and conducts "trade" and "commerce" within the meaning of WCPA § 19.86.010(2).

107. Defendant advertised, offered, or sold the E-Scooters in Washington to Washington consumers and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by Wash. Rev. Code § 19.86.010(2).

108. Defendant engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation Wash. Rev. Code § 19.86.010(2) by misrepresenting or omitting material facts regarding the safety of Defendant's E-Scooter as set forth in this Complaint.

109. Consumers cannot avoid any of these injuries caused by Defendant's deceptive labeling and advertising of the E-Scooters. Accordingly, the injuries Defendant caused outweigh any possibly benefit, if any exists, from the marketing and sale of the E-Scooters.

110. The conduct described throughout this Complaint is unfair within the meaning of the WCPA §§ 19.86.010, *et seq.*, because, at all material times, Defendant's statements and marketing and advertising materials misrepresented or omitted material facts regarding the safety of Defendant's E-Scooter as set forth in this Complaint. Defendant is disseminating statements, marketing and advertising concerning the useability and safety of its E-Scooter that are unfair, untrue, deceptive, or misleading. Defendant's acts and practices have deceived and/or are likely to continue to deceive Plaintiff, members of the Washington Subclass, and the public. Moreover, Defendant intentionally does not disclose any of this information to consumers and instead represents that the E-Scooter is beyond average levels of usability and safety.

111. Defendants engaged in these unfair acts or practices in the conduct of their business.

112. The acts and practices described herein are unfair because these acts or practices (i) have caused financial injury to Plaintiff and the Washington Subclass members in the form of overpayment for and diminution in value of their E-Scooters; (ii) are not outweighed by any countervailing benefits to consumers or competitors, and (iii) are not reasonably avoidable by consumers.

113. In making and disseminating the statements alleged herein, Defendant knew or should have known its advertisements were deceptive and misleading. Plaintiff and members of the Washington Subclass based their decisions to purchase and use Defendant's E-Scooter on Defendant's misrepresentations and omissions of material facts.

114. Defendants' misrepresentations are likely to mislead a reasonable consumer acting reasonably under the circumstances.

115. Further, Defendants' acts and practices impact the public interest. Defendants committed the acts and practices in the course of their everyday business; the acts and practices are part of a pattern or generalized course of business; Defendant committed the acts and practices repeatedly and continually both before and after Plaintiff and the Washington Subclass members' purchased Segway E-Scooters; there is a real and substantial potential for repetition of Defendant's conduct; and many customers are affected or likely to be affected.

116. On behalf of himself and other members of the Washington Subclass, Plaintiff seeks to enjoin Defendant's unlawful acts and practices described herein, to recover actual damages, three times actual damages, and reasonable attorneys' fees.

## COUNT VI
### Violation of the Arizona Consumer Fraud Act
### (A.R.S. §§ 44-1521, *et seq*.)
### (On behalf of the Arizona Subclass)

117. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

118. Plaintiff Hanson brings this claim on behalf of himself and the Arizona Subclass.

119. Defendant is a "person" and the E-Scooters are "merchandise" as defined by the Arizona Consumer Fraud Act ("ACFA"). *See* A.R.S. § 44-1521(5)-(6).

120. Defendant advertised, offered, or sold goods or services in Arizona and engaged in trade or commerce directly or indirectly affecting the people of Arizona.

121. Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts affecting the people of Arizona in connection with the sale and advertisement of merchandise in violation of A.R.S. § 44-1522(A).

122. The conduct described throughout this Complaint is unfair within the meaning of the ACFA §§ 44-1521, *et seq.*, because, at all material times, Defendant's statements and marketing and advertising materials misrepresented or omitted material facts regarding the safety of Defendant's E-Scooter as set forth in this Complaint. Defendant is disseminating statements, marketing and advertising concerning the useability and safety of its E-Scooter that are unfair, untrue, deceptive, or misleading. Defendant's acts and practices have deceived and/or are likely to continue to deceive Plaintiff, members of the Arizona Subclass, and the public. Moreover, Defendant intentionally does not disclose any of this information to consumers and instead represents that the E-Scooter is beyond average levels of usability and safety.

123. Defendants engaged in these unfair acts or practices in the conduct of their business.

124. The acts and practices described herein are unfair because these acts or practices (i) have caused financial injury to Plaintiff and the Arizona Subclass members in the form of overpayment for and diminution in value of their E-Scooters; (ii) are not outweighed by any countervailing benefits to consumers or competitors, and (iii) are not reasonably avoidable by consumers.

125. In making and disseminating the statements alleged herein, Defendant knew or should have known its advertisements were deceptive and misleading. Plaintiff and members of the Arizona Subclass based their decisions to purchase and use Defendant's E-Scooter on Defendant's misrepresentations and omissions of material facts.

126. Defendants' misrepresentations are likely to mislead a reasonable consumer acting reasonably under the circumstances.

127. On behalf of himself and other members of the Arizona Subclass, Plaintiff seeks to enjoin Defendant's unlawful acts and practices described herein, to recover actual damages, three times actual damages, and reasonable attorneys' fees.

## COUNT VII
### Breach of the Implied Warranty of Merchantability

128. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

129. Plaintiff brings this claim individually and on behalf of members of the Class and Subclasses. *See* Cal. Com. Code §§ 2314, 10212; Wash. Rev. Code §§ 62A.2–314 -315; Ariz. Rev. Stat. §§ 47-2314 -2315.

130. Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the E-Scooters are merchantable as a reliable, useable, safe scooter for leisurely transportation and other purposes.

131. Defendant breached the warranty implied in the contract for the sale of the E-Scooter because it could not "pass without objection in the trade under the contract description," the goods were not "of fair average quality within the description," the goods were not "adequately contained, packaged, and labeled as the agreement may require," and the goods did not "conform to the promise or affirmations of fact made on the container or label." *See* U.C.C. § 2-314(2) (listing requirements for merchantability). As a result, Plaintiff and Class Members did not receive the goods as impliedly warranted by Defendant to be merchantable.

132. Plaintiff and Class Members purchased the E-Scooters relying on Defendant's skill and judgment in properly packaging and labeling the E-Scooters.

133. The E-Scooters were not altered by Plaintiff or Class Members.

134. The E-Scooters were defective when they left the exclusive control of Defendant.

135. Defendant knew that the E-Scooters would be purchased and used without additional testing by Plaintiff and Class Members.

136. The E-Scooters were defectively designed and unfit for their intended purpose and Plaintiff and Class Members did not receive the goods as warranted.

137. As a direct and proximate cause of Defendant's breach of the implied

warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the E-Scooters if they knew the truth about the E-Scooters, and because the E-Scooter they received were worth substantially less than the E-Scooter they were promised and expected.

138. On behalf of himself and other members of the class, Plaintiff seeks damages.

<strong><u>COUNT VIII</u></strong><br><strong><u>Breach of Express Warranty</u></strong>

139. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

140. Plaintiff brings this claim individually and on behalf of members of the Class and Subclasses. *See* Cal. Com. Code §§ 2314, 10212; Wash. Rev Code § 62A.2–313; Ariz. Rev. Stat. § 47-2313.

141. Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the E-Scooters are merchantable as a reliable, useable, and safe E-Scooter for transportation.

142. Defendant breached the warranty implied in the contract for the sale of the E-Scooter because it could not "pass without objection in the trade under the contract description," the goods were not "of fair average quality within the description," the goods were not "adequately contained, packaged, and labeled as the agreement may require," and the goods did not "conform to the promise or affirmations of fact made on the container or label." *See* U.C.C. § 2-314(2) (listing requirements for merchantability). As a result, Plaintiff and Class Members did not receive the goods as impliedly warranted by Defendant to be merchantable.

143. Plaintiff and Class Members purchased the E-Scooter relying on Defendant's skill and judgment in properly designing, manufacturing, packaging, and labeling the E-Scooters.

144. The E-Scooters were not altered by Plaintiff or Class Members.

- 25 -<br>Case No. 2:25-cv-03305<br>CLASS ACTION COMPLAINT

145. The E-Scooters were defective when they left the exclusive control of Defendant.

146. Defendant knew that the E-Scooters would be purchased and used without additional testing by Plaintiff and Class Members.

147. The E-Scooters were defectively designed and unfit for their intended purpose and Plaintiff and Class Members did not receive the goods as warranted.

148. As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the E-Scooters if they knew the truth about the E-Scooters and that the E-Scooters they received were worth substantially less than the E-Scooter they were promised and expected.

149. On behalf of himself and other members of the Class and Subclasses, Plaintiff seeks damages.

## COUNT IX
### Unjust Enrichment

150. Plaintiff incorporates by reference and re-alleges all prior paragraphs of this complaint as though fully set forth herein.

151. Plaintiff brings this claim individually and on behalf of members of the Class and Subclasses against Defendant. In the alternative, Plaintiff brings this claim on behalf of the Class.

152. Plaintiff and Class Members conferred benefits on Defendant by purchasing the E-Scooter.

153. Defendant has knowledge of such benefits.

154. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the E-Scooter. Retention of those monies under these circumstances is unjust and inequitable because Defendant represented that the E-Scooter is safe for its principal use of reliably and safely transporting consumers when it is not.

155. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class Members for its unjust enrichment, as ordered by the Court.

## COUNT X
### Breach of the Magnuson-Moss Warranty Act
### (15 U.S.C. §§ 2301, *et seq.*)

156. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

157. Plaintiff brings this claim individually and on behalf of the members of the Class and Subclasses against Defendant.

158. Plaintiff and the other class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

159. Segway is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4)-(5).

160. The E-Scooters are "consumer products" within the meaning of § 2301(1).

161. Segway's express warranty is a "written warranty" within the meaning of § 2301(6).

162. As detailed above, Segway breached its warranty obligations by failing to provide a product that conformed to the promises and affirmations Segway made about the E-Scooters, by failing to truthfully advertise and warrant that the E-Scooters were safe, free of defect, and fit for their intended purpose. The Defect in the E-Scooters existed at the time the E-Scooters left Segway's control and Segway failed to disclose the existence of the Defect either prior to, at the point of, or following sale of the E-Scooters, including when customers contacted Segway to inquire about the E-Scooter's failures. Segway's conduct has rendered the warranties null and caused them to fail of their essential purpose.

163. Segway's breach of warranty deprived Plaintiff and Class Members of the benefit of their bargain.

164. The amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

165. Further, pursuant to the provisions of 15 U.S.C. § 2310(e), Plaintiff, on behalf of himself and Class Members, sent notice to Segway to provide it with reasonable opportunity to correct its business practices and cure its breach of warranties under the MMWA.

166. In addition, resorting to any sort of informal dispute settlement procedure or affording Segway another opportunity to cure its breach of warranty is unnecessary and futile. Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Segway has repeatedly mispresented the true quality and nature of the E-Scooter, and has indicated no desire to participate in such a process at this time. Any requirement under the MMWA or otherwise that Plaintiff submit to any informal dispute settlement procedure or otherwise afford Segway reasonable opportunity to cure its breaches of warranty is excused and/or has been satisfied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of himself and members of the Class and Subclasses as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class, and Plaintiff's attorneys as Class Counsel;

B. For an order declaring that Segway's conduct violates the statutes referenced herein;

C. For an order finding in favor of Plaintiff, the Class on all counts asserted herein;

D. For actual, compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E. For injunctive relief enjoining the illegal acts detailed herein;

F. For prejudgment interest on all amounts awarded;

G. For an order of restitution and all other forms of equitable monetary relief;

H. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expense and costs of suit.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

DATED: April 15, 2025     By: /s/ *Justin B. Farar*
                    Justin B. Farar

Justin B. Farar (SBN 211556)
12400 Wilshire Boulevard, Suite 910
Los Angeles, CA 90025
Telephone: 310-614-7260
Facsimile: 310-614-7260
Email: *jfarar@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
Clarissa R. Olivares (SBN 343455)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: *lking@kaplanfox.com*
*mgeorge@kaplanfox.com*
*breed@kaplanfox.com*
*colivares@kaplanfox.com*

*Attorneys for Plaintiff Paul Hanson and the Proposed Class*

Case No. 2:25-cv-03305
CLASS ACTION COMPLAINT

# Exhibit 4

## COOCH AND TAYLOR P.A.

**EDWARD W. COOCH JR.**
**1920-2010**

**DONALD C. TAYLOR**
**1930-2005**

**ATTORNEYS AT LAW**

**THE NEMOURS BUILDING**
**1000 NORTH WEST ST.**
**SUITE 1500**
**P. O. BOX 1680**
**WILMINGTON, DE 19899-1680**

**C. SCOTT REESE**
**BLAKE A. BENNETT**
**R. BRUCE MCNEW**
**R. GRANT DICK IV**
**CARMELLA P. KEENER**
**DEAN ROLAND**

**WWW.COOCHTAYLOR.COM**

**T  302.984.3800**
**F  302.984.3939**

**KEVIN D. LEVITSKY**

# THE FIRM

Cooch and Taylor, P.A., one of Wilmington's oldest and most respected law firms, was founded in 1960 by Edward W. Cooch, Jr. and Donald C. Taylor.  Today it maintains a growing practice specializing in civil litigation.  Its diverse practice serves the local community as well as national entities.

Cooch and Taylor's Mission Statement best describes its overall approach to the practice of law:

To provide prompt and competent legal services to the Firm's clients in a professional manner in keeping with the highest standards of the legal profession at a cost that is fair both to the clients and to the lawyers and staff of the Firm.

To maintain a working environment for the lawyers and staff of the Firm which will enable and encourage each individual to mature and grow both as a professional and as an individual.

To encourage lawyers and staff to actively participate in professional and civic activities which will improve the competency, ethics and efficiency of the legal profession and the quality of life for all people.

The Firm has an established reputation for outstanding client service and an unrivaled work environment.

# PRACTICE AREAS

## *Litigation*

The professionals in Cooch and Taylor's Litigation Department have years of experience in the prosecution and defense of civil litigation. They regularly represent institutional and individual investors, national corporate clients, and local businesses in the full range of litigation in the Delaware courts. The Firm frequently relies upon its unique resources and experience in prosecuting class action and shareholder derivative actions in the Court of Chancery, the Delaware Supreme Court, and the District Court of Delaware.

## *Business and Commercial Bankruptcy*

Cooch and Taylor's Business and Commercial Bankruptcy practice has evolved and expanded during the last thirty years from primarily the representation of liquidating trustees to include broad involvement in a significant number of large Chapter 11 cases filed in the District of Delaware. While handling sophisticated matters, the Firm's bankruptcy attorneys pride themselves on providing personalized service to all their individual and corporate clients.

The bankruptcy attorneys represent a broad array of creditors in Chapter 11 cases including secured and unsecured creditors, trade creditors, landlords, equipment lessors, governmental entities and others. They also represent parties in multiple types of bankruptcy litigation matters before the United States Bankruptcy Court, the United States District Court and the Third Circuit Court of Appeals. They have been involved in thousands of preference and fraudulent conveyance actions.

In addition to the direct representation of clients, the department also provides Delaware local counsel services for out-of-state lawyers.

# ATTORNEYS

**BLAKE A. BENNETT**
**Director**

**EDUCATION**

University of Delaware, B.A., 2001
Thomas Jefferson University Medical College, 2002-2004
Widener University School of Law, J.D., 2008, (Delaware Journal of Corporate Law, Moot Court Honor Society, Order of Barristers)

**ADMISSIONS**

Delaware, 2008
U.S. District Court for the District of Delaware, 2009

**MEMBERSHIPS**

American Bar Association
Delaware State Bar Association
Rodney Inn of Court

**PROFESSIONAL EXPERIENCE**

Mr. Bennett focuses his practice primarily on litigating corporate governance matters, regularly representing institutions and individuals in class and derivative actions. He has significant experience representing shareholders in Delaware's Court of Chancery, the United States District Court for the District of Delaware, and Delaware's Supreme Court.

In addition to appearing before all of Delaware's trial courts, Mr. Bennett has successfully briefed and/or argued several appeals before the Delaware Supreme Court. Prior to joining Cooch and Taylor, Mr. Bennett completed a one year clerkship for Chief Justice Myron T. Steele of the Delaware Supreme Court.

**REPRESENTATIVE ACTIONS**

*Professional Investigating and Consulting Agency, dba PICA, v. Hewlett Packard Company*, Superior Court of Delaware Complex Commercial Litigation Division: Successfully represented brand protection and supply chain management company in claim against HP for trade secret misappropriation, breach of the implied covenant of good faith and fair dealing, and defamation. After a three week trial, the jury awarded $6,518,000 in damages, and the trial judge also awarded over $1,000,000 in attorneys' fees.

*JVSW LLC v. Saladworks LLC et al.*, Delaware Court of Chancery and United States Bankruptcy Court for the District of Delaware: Successfully represented majority owner in dispute concerning breach of contract, breach of fiduciary duty, and unjust enrichment.

*Ponzio, et al. v. Preston, et al.*, Delaware Court of Chancery: Successfully represented minority stockholders in claim against Velcera Inc.'s board of directors for breach of fiduciary duty by illegally transferring more than 80% of Velcera's equity to certain investors without informing the public shareholders and then selling the company. Pursuant to the original terms of the merger, holders of the type of shares held by Plaintiffs and the members of the settlement class were to receive between $3.4 million and $4.9 million of the purchase price. As part of a settlement, those stockholders received another $3,850,000.

*AJZN Inc. v. Donald Yu, et al.*, United States District Court for the District of Delaware: Successfully represented warrant holder in breach of fiduciary duty and unjust enrichment claims. After a three day bench trial, the parties reached a settlement agreement.

*Hurwitz v. Mullins, et al.*, United States District Court for the District of Delaware: Successfully represented LRR Energy L.P. unitholders in lengthy litigation concerning the acquisition of LRR Energy L.P. by Vanguard Natural Resources LLC in 2015. After surviving several dispositive motions and a navigating a complicated bankruptcy of Vanguard, the case settled with the creation of an $8,000,000 settlement fund for the unitholders.

*Steve v. Williams, et al.*, Delaware Court of Chancery: Successfully represented former stockholders of Miramar Labs Inc. in challenging the acquisition of Miramar by Sientra Inc. Through Plaintiff's efforts, the case settled with the creation of a $410,000 settlement fund. That amount represented a 100% increase over the amount the Miramar shareholders were to receive through the transaction.

*Riche v. Pappas, et al.*, Delaware Court of Chancery: Delaware Counsel in class action for breach of fiduciary duties to shareholders against the target board and activist investors relating to a proposed merger of a publicly traded geothermal company. Settlement consisted of $6.5 million common fund, which represented a significant 7.7% premium to the $84 million adjusted enterprise value of the merger to the non-defendants shareholders/class members.

*Irving Firemen's Relief and Retirement Fund v. Page, et al.*, Delaware Counsel in Derivative action against the directors of Google's parent company Alphabet. Settlement led to the creation of a $310 million diversity, equity, and inclusion fund relating to the company's alleged mishandling of sexual harassment allegations against senior executives and the company's alleged overall culture of sexual discrimination and harassment.

**R. GRANT DICK IV**
**Director**

**EDUCATION**

Virginia Tech, B.S., 2004
University of Richmond, T.C. Williams School of Law, J.D., 2007

**ADMISSIONS**

Delaware – 2008
United States District Court, District of Delaware – 2008
New Jersey – 2007 United States District Court, District of New Jersey –2007
United States Court of Appeal for the Third Circuit – 2015

**PROFESSIONAL EXPERIENCE**

Mr. Dick concentrates his practice in the areas of bankruptcy as well as Corporate and Commercial litigation before all of Delaware's trial courts.

In his bankruptcy practice, Mr. Dick represents creditors of all sizes, from institutions and state entities to individual creditors (including WARN claimants.) He has represented Chapter 7 trustees and post-confirmation Plan Administrators, advising on all aspects of estate administrations. This includes claims objections and prosecutions, claims administration, pursuing bankruptcy and non-bankruptcy litigation, and liquidating assets for the benefit of creditors. He has served as lead counsel in several corporate Chapter 7 cases and has significant experience prosecuting and defending preferences/avoidance actions.

**REPRESENTATIVE MATTERS**

*In re: Jack Cooper Transport Company, LLC, et al.*: Delaware Counsel in pending class action alleging violations of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–2109.

*In re: RS FIT NW, LLC*: Delaware Counsel to Class Claimants successfully resolving class claims asserted in *Labib et al. v. 24 Hour Fitness USA, Inc.* regarding membership dues withdrawn from member accounts despite the nationwide closure of 24 Hour Fitness gym facilities.

*In re: Southland Royalty Company, LLC*: Counsel to various oil and gas lessors, analyzing and ensuring O&G leases dating back decades were appropriately assumed and assigned in the case.

*In re: Zloop, Inc.*: Bankruptcy Counsel to Post-Confirmation Debtor/Plan Administrator – Administration of post-confirmation bankruptcy including advising Plan Administrator regarding litigation in various venues, claims administration, reporting requirements, and interim distributions;

*In re: Venoco, LLC*: Represented major stakeholder in oil and gas bankruptcy case through confirmation, including depositions and negotiations related to confirmation objections;

*In re: Opus South Corporation and affiliates*: Co-Lead Counsel – Liquidation of estate assets enabling at least one subsidiary to obtain a full recovery and upstream of funds to parent;

*In re: Facility Maintenance Services LLC*: Lead counsel to Chapter 7 Trustee – Successfully obtained modest recovery for general unsecured creditors in a case initially perceived to administratively insolvent;

*In re: Pylon International, Inc.*: Lead counsel to Chapter 7 Trustee – Successfully obtained modest recovery for general unsecured creditors in a case initially perceived to administratively insolvent;

*In re: Vaso Active Pharmaceuticals, Inc.*: Counsel to Chapter 11 Avoidance Action Trustee – Obtained judgments in excess of one million dollars against insiders, successfully defending appeals up to the Third Circuit;

Represented Defendants in Avoidance Actions and Fiduciary Duty Actions, including, but not limited to, defendants in the following cases: *Citadel Watford City Disposal Partners, L.P.*; *WP Steel Venture, LLC*; *NewPage Corporation*; *The Wet Seal, LLC*; *Hancock Fabrics, Inc.*; *Meridian Automotive Systems, Inc*; *Exide Technologies*

**PROFESSIONAL AFFILIATIONS**

American Bankruptcy Institute
Turnaround Management Association
Business Torts: A Fifty-State Guide (Wolters Kluwer), Contributing Editor for Delaware
Tort Law Desk Reference (Wolters Kluwer), Contributing Editor for Delaware
Delaware State Bar Association

**PERSONAL AND COMMUNITY ACTIVITIES**
Friends of Wilmington Parks – Fundraising Committee
Wilmington Little League, Inc. – Board of Directors

**CARMELLA P. KEENER**
**Director**

**ADMISSIONS**
Delaware, 1990
Delaware District Court, 1990
Third Circuit Court of Appeals

**MEMBERSHIPS**
Delaware State Bar Association Combined Campaign for Justice, New Castle County Co-Chairperson (2006-2014); General Co-Chair (2015-2016); Lead Chair (2017)
Delaware State Bar Association Executive Committee (2008-2009)

**PROFESSIONAL EXPERIENCE**

Carmella Keener began her legal career as a judicial law clerk in the Delaware Superior Court, managing complex construction claim and complex insurance coverage litigations for three judges. Since 1991, she has focused her practice in corporate and commercial litigation, representing stockholders in class and derivative litigations pending before the Delaware Court of Chancery. She has also served as Delaware counsel in admiralty and class actions before the Delaware District Court. Since 1991, she has represented a number of insurance companies in insurance coverage disputes in the Delaware Superior Court, including in the Complex Commercial Litigation Division.

Carmella has served on the e-Filing Subcommittee to the Court of Chancery Rules Committee, has served as a New Castle County Co-Chairperson for the Delaware State Bar Association's Combined Campaign for Justice, and is a past member of the Executive Committee of the Delaware State Bar Association.

Carmella's recent successes in cases where she had a significant role include:

- A $16.25 million settlement of a derivative litigation alleging *Brophy* claims
- Summary judgment on behalf of an insurer in a complex insurance coverage case, which was affirmed on appeal to the Delaware Supreme Courts
- Jury verdict on behalf of insurer on complex insurance coverage claim, affirmed on appeal to the Delaware Supreme Court
- Multi-million dollar settlement of a derivative litigation with an immediate distribution of the net proceeds to the shareholders
- A $52 million settlement of a class action on behalf of minority shareholders on the eve of  trial on fiduciary duty claims in connection with a merger
- Settlement of claims after trial on behalf of minority shareholders cashed out for nominal consideration in a going-private transaction, which settlement resulted in gross additional consideration worth 6.7 times more than the original consideration
- Representing the indenture trustee of a bondholders committee and achieving on behalf of the committee partial summary judgment regarding issues of default under the indenture
- Summary judgment on behalf of insurance companies in coverage litigation regarding insurers' obligation to pay tobacco-related illness and death claims

**KEVIN D. LEVITSKY**
**Associate**

**EDUCATION**

Gettysburg College, B.A. Political Science (2019)
Widener University-Delaware Law School (2022)

**ADMISSIONS**

Delaware, 2023
Pennsylvania, 2023

**MEMBERSHIPS**

Young Lawyers Society
Delaware State Bar Association
Pennsylvania Bar Association
Rodney S. Inns of the Court

**PROFESSIONAL EXPERIENCE**

Mr. Levitsky interned for the Honorable Ferris W. Wharton at the Delaware Superior Court before joining the Attorney General's office as Deputy Attorney General in the Consumer Protection Unit; represented the Attorney General in a custodial petition in the Court of Chancery regarding an abandoned non-profit corporation; enforced the Delaware Consumer Fraud and Deceptive Trade Practices Act; initiated cannabis regulations and enforcement as it relates to representations made to consumers; facilitated multistate antitrust investigations; acted as the Delaware representative for the Class Action Fairness Act; aided in drafting settlement documents; issued subpoenas, and drafted complaints.

.

**R. BRUCE MCNEW**
**Director**

**EDUCATION**

University of Virginia B.A., 1975 with Distinction Economics and Political Science
Marshal-Wythe School of Law, College of William and Mary, J.D., 1979

**ADMISSIONS**

Delaware, 1979
Pennsylvania, 1984
California, 1990

**PERSONAL AND COMMUNITY ACTIVITIES**

Office of Child Advocate, Volunteer
Kennett Area YMCA, Past Board Member
Delaware Center for Horticulture, Past Board Member

**PROFESSIONAL EXPERIENCE**

Bruce McNew was admitted to practice in Delaware in 1979 and subsequently was admitted in Pennsylvania and California. His practice focusses on litigation representing the rights of investors and on other complex commercial disputes in state and federal courts nationwide, including in the Delaware Court of Chancery. Bruce regularly represents plaintiffs in class actions and derivative suits. He has also represented plaintiffs in other complex litigations in the areas of securities law, environmental law, insurance law and labor law. In his career, Bruce has conducted jury and non-jury trials, arbitrations and handled appeals in various states, including before the Delaware Supreme Court, and in Federal Courts of Appeal. Bruce has been involved in cases resulting in the recovery of hundreds of millions of dollars for investors.

Bruce is a 1979 graduate of the Marshall Wythe School of Law, the College of William and Mary, where he served as Research Editor of the Law Review, and a 1975 graduate of The University of Virginia where he graduated with distinction. Prior to joining the Firm, Bruce had been a partner in several firms, as well as a sole practitioner. He began his career clerking for the Honorable John J. McNeilly, Justice of the Supreme Court of Delaware and as an associate at a major Delaware firm . He is admitted to practice in the States of Delaware, Pennsylvania and California, the Federal District Courts for the District of Delaware, the Eastern District of Pennsylvania and the Northern, Central, Eastern and Southern Districts of California, the United States Court of Appeals for the Third, Tenth and Eleventh Circuits and the Supreme Court of the United States.

Bruce is currently lead counsel in actions for breach of fiduciary duty in the Court of Chancery relating to going private transactions, a self-tender, and appraisal rights and in an action in the Superior Court of California challenging a Reverse Stock Split and going private plan. He also appears in the Delaware Superior Court. He has successfully tried actions seeking books and records before the Court of Chancery. Bruce's concluded engagements have included:

•         Lead counsel in Buttonwood Tree Value Partners LP v. Smith, C.A. No. 08-CV-2963 (Circuit Ct. Wisconsin 2010), resulting in a recovery valued at $54 million.

•         Sole Derivative counsel in the trial of Hollinger Int'l Inc. v. Black, 844 A.2d 1022 (Del. Ch. 2004) which resulted in recovery of $50 million.

•         Sole counsel to shareholders in Franklin Balance Sheet Investment Fund v. Crowley, 2007 WL2495018 (Del. Ch. 2007), which resulted in a benefit to minority shareholders of $37.25 million.

•         Co-lead counsel to shareholders in In re Best Lock Corp. Shareholder Litigation, 845 A.2d 1057 (Del. Ch. 2001) which resulted in a recovery in excess of $60 million.

•         Co-lead counsel in In re Pure Resources Inc., Shareholders Litigation, 808 A.2d 421 (Del. Ch. 2002) resulting in a judgment requiring additional material disclosures to shareholders.

•         Lead Counsel in Kathryn Casey, et al. v. George G. Brennan, et al., Consol. Docket No. UNN-C-180-97 (Superior Ct., NJ), resulting in a judgment of approximately $12.5 million on behalf of minority stockholders who were subjected to a freeze out merger.

•         Lead trial counsel in Glassman v. UNOCAL Exploration Corp., 777 A.2d 242 (Del. Supr. 2001), which was immediately recognized as resolving significant issues of Delaware Corporate law and continues to have a substantial impact on mergers and acquisitions practices.

**C. SCOTT REESE**
**Director**

**EDUCATION**

Colgate University, B.A., 1978
Widener University School of Law, J.D., 1981

**ADMISSIONS**

Delaware, 1981
U.S. District Court for the District of Delaware, 1981
Supreme Court of Delaware, 1981
U.S. Court of Appeals for the Third Circuit, 1981

**MEMBERSHIPS**

American Bar Association
Delaware Bar Association
Defense Research Institute
Defense Counsel Of Delaware

**PROFESSIONAL EXPERIENCE**

ASBESTOS LITIGATION - Lead counsel in Delaware representing manufacturers of numerous products such as insulation, textiles and equipment.  Responsibilities include case management, discovery, depositions and trials from 1983 to present.

ASBESTOS LITIGATION - Trial counsel in Baltimore, Maryland, for 26 consolidated cases referred to as the ABATE mini-trial.

CONSTRUCTION LITIGATION - Counsel in Delaware for large developer of Bethany Beach resort.  Condominium council brought claims against developer, supplier and architects;

Counsel for condominium complex council against developer and builder of condominium complex in Wilmington, Delaware.

Approximately 20 trials, most lasting more than 2 weeks - 2 months.

| Date | Case Name | Length of Trial | Result | Judge |
|------|-----------|-----------------|--------|-------|
| 1983 | MacGuigen v. GM | 3 Days | Verdict | Stiftel |
| 1987 | George v. RM | 10 Weeks | Verdict | Taylor |
| 1988 | Temple v. RM | 3 Weeks | Verdict | Taylor |
| 1988 | Temple v. RM | 4 Weeks | Verdict | Taylor |
| 1989 | Farrell v. Celotex | 8 Weeks | Verdict | Taylor |

| 1990 | Freeman v. Condominium Council | 4 Weeks | Verdict | Del Pesco |
|---|---|---|---|---|
| 1995 | Smoot v. QBW | 10 Days | Verdict | Babiarz |
| 1996 | Kempe v. Electrolux[1] | 2 2 Weeks | Verdict | Schwartz |
| 1996 | Ely v. Lenscrafters | 2 2 Weeks | Verdict | Bifferato |
| 1998 | Dorset v. Stoltz | 3 Weeks | Settled | Del Pesco |
| 1999 | Francine v. Stoltz | 1 Day | Verdict | Lucas |
| 1999 | Lucas v. Christiana Skating | 1 Week | Verdict | Bifferato |
| 1999 | Hibble v. Mack | 3 Weeks | Settled | Herlihy |
| 1999 | Lingafelt v. Ryder | 2 Weeks | Verdict | Bifferato |
| 1999 | Stoltz v. Leslie Orr | 2 Weeks | Settled | Babiarz |
| 1999 | Edwards v. Ryder | 3 Days | Verdict | Alford |
| 2000 | Ellinger v. AC and S[2] | 6 Weeks | Verdict | Murdock |
| 2000 | Hollis v. PCC | 5 Weeks | Verdict | Babiarz |
| 2002 | Parish v. Ryder | 2 Days | Verdict | Herlihy |
| 2003 | State v. Wellington | 1 Week | Mistrial | Vaughn |
| 2004 | State v. Wellington | 8 Weeks | Verdict | Vaughn |
| 2006 | Shreiner v. Pneumo Abex | 2 Weeks | Settled | Slights |

[1]U.S.D.C., Delaware

[2]Baltimore County, Maryland

**DEAN R. ROLAND**
**Director**

**EDUCATION**

University of North Carolina Asheville, 2014
Widener University Delaware Law School, J.D., 2017, cum laude

**ADMISSIONS**

Delaware, 2017

**MEMBERSHIPS**

Delaware State Bar Association

**PROFESSIONAL EXPERIENCE**

In addition to serving as lead counsel in a variety of matters involving construction and commercial litigation, Dean also serves as local, liaison counsel in both individual and class action proceedings where his trial experience can be of benefit to out-of-town lead counsel.

*BJ's Wholesale Club, Inc. v. GroupKLT, Inc.* – successfully represented BJ's Wholesale Club as lead counsel in a breach of contract action against GroupKLT obtaining a favorable judgment over $1MM.

*Lyons v. Wilson et al.*, – represented the Defendant as lead counsel in a bench trial involving breach of non-solicitation and non-competition agreements that ultimately concluded in a favorable posttrial settlement.

*Fountainview v. Corrozi et al.*, – successfully represented the Fountainview Condominium Complex Association against its builders, alleging defective construction, ultimately obtaining a favorable settlement.

*Robino v. Robino* – successfully objected to a multi-million-dollar debt being discharged in bankruptcy on the grounds of fraud. The case was later litigated in the Court of Chancery whose findings were upheld on appeal to the Delaware Supreme Court.

*Bolander et al. v. Handler et al.*, - successfully represented a community of homeowners as lead counsel against the builder and its subcontractors that ultimately resulted in a favorable settlement.

*Porter et al. v. Capano et al.*, - successfully represented a community of homeowners as lead counsel against the builder and its subcontractors that ultimately resulted in a favorable settlement.

*Friedmann v. Tomanovic et al.*, - successfully represented Friedmann against Tomanovic and his companies as lead counsel in an action involving breach of contract and fraud that resulted in obtaining a favorable judgment.

*In Re Asbestos Litigation* – successfully obtained summary judgment on behalf of multiple Defendants in a multitude of cases.

Prior to joining Cooch and Taylor, Mr. Roland served as an intern for the Honorable Paul R. Wallace at the Delaware Superior Court.  Mr. Roland also served as an intern for the Honorable Robert H. Surles at the Delaware Court of Common Pleas.  Mr. Roland acted as a law clerk at Cooch and Taylor before being admitted to the Delaware Bar.  Prior to beginning law school, Mr. Roland served as a team captain on the University of North Carolina Asheville's Division I Baseball Team.